Alexander Berman, J.
Pursuant to the direction of a Justice of this court, a hearing was held before me in connection with the motion of defendant, former wife, for entry of a money judgment for arrears in alimony and other relief and the cross motion by plaintiff, former husband, for an order based solely on section 248 of the Domestic Relations Law, seeking to strike from the final judgment of divorce a provision for alimony on the ground that "defendant herein is *786 habitually living with another man and holding herself out as his wife.”
At the commencement of the hearing, plaintiff conceded that he had made no payment of alimony for the period from January 1, 1977 to April 1, 1977, at $100 per week, for a total of $1,400, and also that if a judgment were recovered against him for said arrears, he would be financially able to pay same.
Defendant conceded that she was, and had been for a number of months, living with a man, sharing with him her bedroom in her apartment wherein the two female children, aged 14 and 13, issue of the parties, also resided, occupying a separate bedroom. However, defendant denied that she was holding herself out to be the wife of this man, nor has any proof been presented to refute her contention in this regard. The evidence is that she referred to him as her "boy-friend,” or "friend,” and he referred to her as his "friend.”
The man involved, Louis Nolls, is approximately 23 years of age, and she is 39. She is a social worker employed by a county agency dealing with drug and alcohol addiction and he is now employed as a caretaker on a small estate. She earns a substantial salary and he earns a small salary, less than $100 per week. Apparently, the two met in the course of her employment as a counselor with the alcoholic addiction agency. His former alcoholic problem apparently resulted in his arrest and conviction, which resulted in a sentence of probation. Excerpts from his presentence probation report were read into the record and revealed that Nolls and another man were found in a bar during the nighttime and that they ignited some papers and other material which resulted in a small fire. He and his companion were arrested in the premises. This background of defendant’s "friend” is related herein only because plaintiff urges that the combination of the fact that this woman, living openly and notoriously with a male friend with this background, in the same household with her two children should not be tolerated by the court. However, counsel concedes that plaintiff, the father of these two children, does not seek to remove custody from his former wife, but only to deny her alimony. Obviously, the denial of alimony will not change the situation existing in defendant’s home.
It is clear that defendant is not deriving any financial support from Nolls for he contributes, out of his marginal salary, only the sum of approximately $50 per week as his *787 share of the expenses attributable to his occupancy, which sum obviously cannot be considered as support for defendant.
Plaintiff contends that the relationship of defendant with Nolls is tantamount to a husband and wife status in that they live together, sleep together, attend functions and visit with friends and relatives together in the same manner as would a husband and wife, and that such a relationship should be sufficient to justify the court’s invoking the provisions of section 248 even in the absence of a showing of a holding out. In Stern v Stern (88 Misc 2d 860) I was faced with an almost identical factual situation and found that both an habitual living together and a holding out must be established before the punitive provisions of section 248 may be applied. The reasons set forth for my determination in Stern are equally applicable to this proceeding, and need not be set forth at length in this decision.
I will, however, discuss two of plaintiff’s arguments addressed to my opinion in Stern. The first being that my holding in Stern is contrary to the intent of section 248. Counsel argues that the available legislative history of the 1938 amendment of then section 1159 of the Civil Practice Act (L 1938, ch 161) indicates its purpose was to prevent a situation where an ex-wife was supporting her lover with alimony received from her former husband. Leaving aside the fact that plaintiff has not established the fact that defendant is, in fact, supporting Nolls, this argument must fail on two grounds, the first being the wording of the section itself, the second the amendment’s legislative history.
The wording of section 248 is clear and unambiguous. It mandates the termination of alimony in the event of the wife’s remarriage and empowers a court, in its discretion, to terminate it when it has been established that a wife is habitually living with another man and is holding herself out as that man’s wife. Simple and concise; termination upon remarriage, possible termination upon assuming the outward appearance of a remarriage.
I am aware of the fact that despite the wording of section 248 the provision with respect to a holding out appears to have been relegated to antiquity in a number of recent cases. (See Northrup v Northrup, 52 AD2d 1093; Latzky v Latxky, NYU, Jan 9, 1976, p 7, col 3; Matter of Anonymous, 90 Misc 2d 801; Levine v Levine, 79 Misc 2d 149.) These decisions must, if the rules governing statutory interpretation are to *788 have any meaning at all, be interpreted as being based upon the premise that once an habitual living together has been established, a holding out will be presumed, Both here and in Stern the individuals involved readily conceded they were living together. However, in each instance, they testified that they went to great lengths to inform the world they were not married. With certain minor exceptions present in Stem, absolutely no evidence was brought forth to show that the parties had ever referred to themselves as husband and wife. Were I to presume a holding out in the face of the evidence at the hearing, I would be forced to say that the mere habitual living together gave rise to an irrebuttable presumption of a holding out. Such a holding would lead to the conclusion that the Legislature was being redundant when it provided for conjunctive requirements.
Obviously, such a conclusion would not be justified.
"In the construction of a statute, meaning and effect should be given to all its language, if possible, and words are not to be rejected as superfluous when it is practicable to give each a distinct and separate meaning.” (McKinney’s Cons Laws of NY, Book 1, Statutes, § 231.)
"Words are not to be rejected as superfluous when it is practicable to give to each a distinct and consistent meaning. 'The good expositor * * * makes every sentence have its operation to suppress all the mischiefs; he gives effect to every word of the statute; he does not construe it so that anything should be vain and superfluous’ ”. (Palmer v Van Santvoord, 153 NY 612, 616, citing Coke’s Rep Part VIII, p 310.)
It may well be that the members of the 1938 Legislature did not, or could not, foresee a society in which unmarried couples could live together openly without fear of social ostracism. However, that lack of foresight cannot be used as the basis for disregarding the wording of section 248. If the holding out provision is now an anachronism because of present lifestyles, the remedy lies in amendment, not judicial fiat.
Put another way, section 248 means what is says, not what a Judge would like it to say.
Assuming, arguendo, that I am required to look behind the wording of the statute itself to determine its intent, a similar conclusion must be reached with respect to what must be established before the punitive provision of section 248 may be applied.
*789 The only available indication of the intent of the 1938 amendment (L 1938, ch 161) to section 1159 of the Civil Practice Act (now Domestic Relations Law, § 248) is to be found in the legislative bill jacket containing the various Bar Association recommendations and the letters sent to then Governor Lehman prior to his signing the bill into law.* From a review thereof and a reading of the decisions in Waddey v Waddey (168 Misc 904, affd 259 App Div 852, revd 290 NY 251, decided on the issue of retroactivity), it is possible to reconstruct the events leading up to passage and enactment.
The legislation in question was not prompted by a hypothetical moral outrage on the part of the legislators, nor was it prompted by a desire to put an end to a widespread "racket” whereby an ex-wife would use alimony to support a new lover. It came about as a direct result of an actual case, and was, in fact, enacted largely through the efforts of a lawyer for one of the parties involved (see Waddey v Waddey, 290 NY 251, 256, supra).
Sometime in 1928, Ethel Waddey obtained a decree of divorce from her husband, Everett Waddey, Jr., which provided for the payment of alimony. Thereafter, the former Mrs. Waddey took up residence with another man. Upon becoming aware of the situation, in 1936 Mr. Waddey instituted a proceeding pursuant to section 1159 of the Civil Practice Act in Supreme Court, Kings County, to annul the alimony provision of the divorce decree. This proceeding was referred to an Official Referee (Norman S. Dike) for hearing and recommendation. At the hearing before Judge Dike, it was established that the former Mrs. Waddey had entered into a relationship with a man which might best be described as a marriage without ceremonial sanction, or, if it had been entered into a few years prior, a common-law marriage. They lived together, presumably slept together, and held themselves out to the neighbors and friends as husband and wife, and as the evidence established, this new man provided Mrs. Waddey with support and maintenance.
*790 Because of Hayes v Hayes (220 NY 596) which held that a wife’s misconduct by fornication or immoral course of living subsequent to a final decree of divorce did not justify the termination of alimony, the Referee felt compelled to recommend that the proceeding be dismissed. His determination was reluctantly confirmed by Justice Mitchell May on March 13, 1937.
This "immoral” situation, and the decisions which seemed to condone it, received widespread attention which, in turn, generated a number of critical editorials. As a reaction thereto, and as previously noted, at the instance of Mr. Waddey’s counsel, a proposed amendment to section 1159 of the Civil Practice Act was introduced at the 1937 legislative session by Assemblyman E. G. Moran. The proposed amendment provided alimony could be terminated "upon proof that the wife is living with another man and holding herself out as his wife and receiving support for him although not married to such man.” (1937 A.P. 2803, Int. 2344.)
This proposed amendment failed to obtain the required support and was not enacted. Its relevance to this discussion lies in the fact that it is indicative of the fact that legislation was being sought to remedy situations such as present in Waddey, that it was not aimed solely at immorality and that it was not seeking to eliminate the keeping of men by ex-wives.
In any event, Assemblyman Moran introduced a second bill during the 1938 session. This amendment did not require a showing of support by the new man. The original draft required only a living together and a holding out. At the urging of New York County Lawyers Association, the requirement that the new man and the wife live together was further limited to those instances where it was "habitual.” However, despite the fact that their recommendation was followed, and because the bill failed to provide the support element present in the 1937 version, the New York County Lawyers Association recommended the bill be disapproved. On the other hand, the Association of the Bar of the City of New York recommended passage. Both reports make no mention of any questions of morality or schemes to bilk ex-husbands.
The apparent confusion over the intent of the section would seem to be traceable to a portion of Assemblyman Moran’s two-page letter to then Governor Lehman dated March 24, 1938. The first page discussed the bill in rather formal lan *791 guage. It pointed out that the fact that the provisions of section 1159 of the Civil Practice Act with respect to loss of alimony in the event of remarriage by a wife could be avoided if "the wife instead of actually marrying the second man lives with him and holds herself out as his wife.”
It is the second page of his letter in which Mr. Moran attains a small degree of immortality in this area. Switching to much more earthy language, for the first and only time, the issue of the ex-wife supporting the new man is interjected. After making reference to the Waddey case, he goes on to cite the following example: "This bill overcomes a racket wherein 'A’, a beautiful young blond, married 'B’, rich old fool and so conducts herself so that within three months 'B’ is most anxious and very agreeable to a divorce and the payment of $200.00 weekly alimony. 'A’ who is very fond of 'C’ also young, wants to marry him but realizes that marriage will deprive her of the $200.00 per week. Instead of marrying 'C’, she lives with him habitually as Mrs. C, and holds herself out as such. Thus both 'A’ and 'C’ live happily ever after on 'B’ 's $200 per week. It is not fair.”
Even in this classic example of a golddigger, Assemblyman Moran assumes that the world at large would be led to believe that A and C were Mr. and Mrs. In fact, it would appear that this was an integral element to their "living happily ever after.” Obviously, this example cannot be used to bolster an argument that section 248 should be applied in cases where immoral conduct, as evidenced by habitually living together, is the only thing that has been established.
One other point should be noted. Unlike the provision with respect to remarriage which is mandatory, the application of the subject provision is discretionary. It seems highly unlikely that the legislators, if, in fact, they were concerned only with the question of immorality as evidenced by habitual living together would have left the termination of alimony to the discretion of the court. It seems eminently clear, to me at least, that were immorality the primary concern, the desired result could have been attained by adding the phrase, "or habitually lives with another man,” to the first sentence of the section. To place a Judge in the position of having to decide which immorality should result in a forfeiture of alimony and which should not, is to clothe him with the cloak of divinity. While I am flattered by the argument, I hardly think it logical. -
*792 It is clear after a review of all the documents submitted in connection with the amendment that its purpose was to rectify a situation where an ex-wife was receiving alimony while she was being accepted by society as another man’s wife.
Counsel also challenges my interpretation of the holding in Northrup v Northrup (supra) in Stern. I disagree that I misinterpreted that holding. However, even in the event counsel is correct, that holding is not binding on me. Until such time as the Second Department passes on that issue, I will hold to my view that both an habitual living together and a holding out must be established.
In making this determination, it is not my intention by any means to condone or approve the defendant’s lifestyle in living with her friend in the same household with her two children. Were this an application to remove custody of the children from the defendant, it would no longer be of concern whether she held herself out as the wife of another man. The issue then would be the best interest of the children and not the one presented.
Finally, assuming arguendo, that the living together is tantamount to a holding out as contemplated by the statute, under the existing circumstances and in the exercise of my discretion, I would decline, under the factual financial conditions disclosed, to modify the provision of the divorce decree with respect to the payment of alimony.
Accordingly, the motion by defendant for judgment against the plaintiff in the sum of $1,400 is granted, and the County Clerk of Nassau County is hereby directed to enter judgment in that amount, and plaintiff’s cross motion to modify is denied.
Counsel fees are hereby awarded to defendant in connection with these proceedings in the sum of $500 which sum shall be paid by plaintiff within 20 days after entry of judgment.

 Legislative bill jacket for chapter 161 of the Laws of 1938, which is available on microfilm at New York Public Library, contains the following: 1938 Report No. 5 of Committee on State Legislation of Association of the Bar of the City of New York; undated letter of Mr. Thomas Corcone; New York County Lawyers letter dated February, 5, 1938 enclosing 1938 substantive report No. 3 dated February 2, 1938; letter dated March 1, 1938 from J. M. Molinari, Esq.; letter dated March 24, 1938 from Assemblyman Edgar F. Moran; letter dated March 28, 1938 from J. M. Molinari, Esq.; letter dated April 21, 1938 from National Divorce Reform League.