In the Matter of VIRGINIA R. BLISS, Respondent, v RICHARD M. BLISS, Appellant.

First Department, March 28, 1985

### APPEARANCES OF COUNSEL

*William G. O'Donnell* of counsel (*O'Donnell, Fox, Gartner & Sobolewski, P. C.,* attorneys), for appellant.

*Noreen M. Giusti* of counsel (*Larry A. Sonnenshein* with her on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for respondent.

### OPINION OF THE COURT

CARRO, J.

In 1938 the Legislature amended Civil Practice Act § 1159, as now expressed in Domestic Relations Law § 248, to overcome the prior bar to termination of alimony where the spouse has remarried. That section goes on to provide for the termination of alimony payments where a former husband offers "proof that the [former] wife is habitually living with another man and holding herself out as his wife, although not married to such man". Five years earlier, in 1933, New York State ceased recognizing "common-law marriage" with the enactment of what is now Domestic Relations Law § 11. In light of this decisive expression of public policy, courts must be extremely

careful when construing the latter part of section 248 so as not to, de facto, create a subspecies of "common-law *remarriage*". That is the issue presented here.

The petitioner and respondent were married in New York on February 25, 1955. Over the next eight years they had four children and in 1960, moved to Wilton, Connecticut. Gradually over the 1960's, the marriage began to deteriorate. The couple separated in the summer of 1969, with a judgment of divorce being entered on July 2, 1970, in the Fairfield (Connecticut) County Superior Court. Petitioner was awarded custody of the children and respondent was directed to pay $640 per month alimony "until the respondent's death or the petitioner's death or remarriage, whichever event shall first occur."

Soon after the divorce, petitioner moved herself and the four children in with a neighbor, Thomas Fleming, a block or two from where the Bliss family had lived. Fleming and petitioner shared the master bedroom, had their meals together and Fleming paid the mortgage, utilities, taxes and insurance on the house. Also, he behaved much as a surrogate father to the children, driving them to social functions, and attending high school sports events with the boys and the daughter's dance performances. Fleming joined the family on holidays, contributed support to them all, and even attended preschool and college graduations in Massachussetts and New Hampshire.

At one point, in early 1971, petitioner told respondent that he should stop paying alimony because she was going to marry Fleming. A few months later, however, she informed respondent that her plans had changed and she would not be remarrying, but not to worry about the alimony since she was going to get a job and take care of herself. Some nine months later, however, petitioner stated that she could no longer live without the alimony and respondent resumed payment.

In 1976, petitioner asked respondent to take the two youngest children because of her professed difficulties. She went to Florida "to build a new life," but returned after a year and then moved to Maine with Fleming, to the property those two had purchased jointly in 1972. Each had paid half the purchase price and they, to this day, split the property taxes. For at least three months, petitioner lived with Fleming in a winterized barn on the land. She then moved to the Bahamas for seven months to live with her parents, but returned in May of 1980 to resume living with Fleming in the barn.

In October of 1981 petitioner moved out of the barn and into a house on property adjacent to the parcel she co-owned with Fleming, and she has remained in that house up to the present.

Petitioner's mother allegedly owns this house. Although petitioner lives alone in the house, Fleming remains in the nearby "barn" and, in petitioner's words, the two residences have "technically the same address". They, of course, continue a relationship, including the intermittent sharing of bed and board, although finances are clearly kept separate.

Respondent ceased alimony payments in July of 1982, after making them regularly for approximately 10 years. In April of 1983 the instant proceeding was commenced pursuant to Domestic Relations Law article 3-A (Uniform Support of Dependents Law), seeking an order enforcing the alimony provision in the Connecticut divorce judgment. Although respondent concedes that he is financially able to make the payments, he maintains that the alimony provision should be annulled pursuant to Domestic Relations Law § 248, *ante*. The Family Court (124 Misc 2d 427) agreed that petitioner's conduct satisfied the statutory requirement of "habitually living with another man", but disagreed that petitioner was "holding herself out as his [Fleming's] wife," citing the Court of Appeals decision in *Northrup v Northrup* (43 NY2d 566). This appeal followed, and we reverse.

In *Northrup* (*supra*), the court was presented with a factual situation much different from the one before us. There it was shown that the former Mrs. Northrup took up housekeeping with another man for only 6½ months, and the Court of Appeals found that "none of the actions exhibited by plaintiff constitute a 'holding out' * * * There is no evidence here other than that plaintiff for six months habitually lived with another man. This is not enough" (43 NY2d, at p 571).

By contrast, petitioner clearly took on all of the accoutrements of married life with Fleming, save the nominal distinction of introducing herself as Virginia Bliss. For the first five or six years after her divorce, petitioner lived with Fleming and shared a family life. Despite occasional extended absences, she has always returned to Fleming. The depth of their affection and interdependence is great and longstanding. Admittedly, by their separate homes, they no longer "appear" as married, but neither can petitioner say that she has been alone on her own for these past 15 years.

In essence, while difficult to define, the distinction required by the statute has already been made by petitioner's conduct over the years. Though perhaps not enough to meet the requirements for common-law marriage in some mythical jurisdiction, the two-prong test of section 248 is satisfied. In light of New York's

52-year public policy against common-law marriage, there could be no logic in a strict adherence to formal signals such as checking account or phone book listings. (*Compare, Northrup v Northrup,* 43 NY2d, at p 571.) And, of course, even that is no indication these days, when many married people are retaining their unmarried surnames.

Instead, courts must look to the variety and duration of actions taken by a former wife in the context of her habitual living with another man. Said another way, we find the statute to be a guardian against the premature cessation of alimony when a former wife be only reacquainting herself with life as a single person, and is still unsettled in her new life. The facts in *Northrup* provide the perfect example, for living with a man for just six months is plainly "not enough" (*supra,* at p 571). With absolutely no indicia that the former Mrs. Northrup had reestablished herself with her new paramour, there was no reason to believe that she was deliberately attempting to circumvent the statute.

The case at bar, on the other hand, points up what mischief the statute can effect if construed too strictly. To allow this petition would be to convert the shield of the statute into a sword of inequity, dependent only upon the deftness with which a former spouse can parry assertions that her conduct in a protracted relationship is marital in substance. This is both unfair to her former husband and contrary to the purpose of the statute. The obligations which arose from a long-dead marriage may be terminated when the purpose of that obligation has also withered away.

Accordingly, the order entered July 3, 1984 in Family Court, New York County (Jack Turret, J.), granting the petition for an order of support, should be reversed, on the law and the facts, and in the exercise of discretion, and the petition dismissed without costs.

MURPHY, P. J., KUPFERMAN, ROSS and MILONAS, JJ., concur.

Order, Family Court of the State of New York, New York County, entered on July 3, 1984, unanimously reversed, on the law and the facts, and in the exercise of discretion, and the petition is dismissed, without costs and without disbursements.