OPINION OF THE COURT
William R. Geiler, J.
Defendant moves for an order staying a hearing on modification of support pursuant to Domestic Relations Law §248 pending a determination as to the constitutionality and enforceability of said statute which provides in pertinent part as follows: "The court in its discretion upon application of the husband on notice, upon proof that the wife is habitually living with another man and holding herself out as his wife, although not married to such man, may modify such final judgment and any orders made with respect thereto by annulling the provisions of such final judgment or orders or of both, directing payment of money for the support of such wife.” The *894 phrase "habitually living with another man and holding herself out as his wife” has previously given rise to some controversy and the question of what conduct on the part of the ex-wife was sufficient to satisfy the statute had long troubled the courts (see, Matter of Anonymous, 90 Misc 2d 801 [Fam Ct, Nassau County 1977]; Levine v Levine, 79 Misc 2d 149 [Sup Ct, Kings County 1974]; Citron v Citron, 91 Misc 2d 785 [Sup Ct, Nassau County 1977]; Stern v Stern, 88 Misc 2d 860 [Sup Ct, Nassau County 1976]; Bliss v Bliss, 107 AD2d 394 [1st Dept 1985]).
The requirement of "habitually living with another man” consists of three elements. The first is the duration of the ex-wife’s relationship; this is, what length of time constitutes "habitually”. Although no minimum length of time has been specified by the courts or by the Legislature, this element requires more than an intermittent intimacy and will not be fulfilled if the ex-wife merely spends a night or weekend with another man (see, Matter of Watson, 39 AD2d 660 [1st Dept 1972]). Relationships of five years, one year, nine months and six months have been held sufficient to satisfy this element (Bliss v Bliss, supra; Stern v Stern, supra; Krawczuk v Krawczuk, 49 AD2d 1003 [4th Dept 1975]; Northrup v Northrup, 52 AD2d 1093 [4th Dept 1976], revd 43 NY2d 566 [1978]). The second element, "living with”, involves the character of the relationship and, although the scope of this element has not clearly been determined, it apparently does not extend to the situation where the ex-wife is merely sharing an apartment or house with another man in the manner of a roommate or housemate (see, Citron v Citron, 91 Misc 2d 785 [Sup Ct, Nassau County 1977], supra; Matter of Anonymous, supra; Stern v Stern, supra). The ex-wife must also have a sexual relationship with the man with whom she is living (Citron v Citron, supra; Stem v Stern, supra). A review of the cases in which an annulment of a maintenance award has been granted reveals a common pattern where the ex-wife and her "POSSLQ” (a "POSSLQ” is [are] two persons of the opposite sex sharing living quarters; see, Bureau of Census, US Dept of Commerce, Statistical Abstract of United States, at 44-45 [1980]; see also, Oldham, Cohabitation by an Alimony Recipient Revisited, 20 J Fam L 615, 646) shared living accommodations, slept together, ate together, shared expenses and generally conducted themselves as a couple (Note, Northrup v Northrup: Termination of Alimony under Section 248 of New York’s Domestic Relations Law, 43 Alb L *895 Rev 967 [1979]). The third element requires that the ex-wife’s relationship be with another man. The statute specifically refers to a heterosexual relationship and it has been held that allegations of an ex-wife’s homosexual relationship cannot provide a basis for the termination of alimony pursuant to Domestic Relations Law § 248 (People ex rel. Kenney v Kenney, 76 Misc 2d 927 [Sup Ct, NY County 1974]).
Before a former husband can obtain relief under Domestic Relations Law § 248, a second requirement must be fulfilled. He must show that his former wife is representing herself as the wife of the man with whom she lives (Northrup v Northrup, supra). Northrup has established that a presumption of "holding out” based solely upon habitually living together is unjustified (43 NY2d 566, 571 [1978], supra). The court specifically emphasized that Domestic Relations Law § 248 consists of a two-part test and that both elements must be proved. Some "assertive conduct” on the part of the ex-wife is needed in addition to habitually living with another man in order to find that a "holding out” has occurred (supra, p 571).
Aside from New York, 10 States have enacted statutes providing for modification or termination of alimony payments upon a showing that the recipient spouse is living or cohabiting with another person (see, Ala Code § 30-2-55; Cal Civ Code § 4801.5; Conn Gen Stats Ann § 46b-86; Ga Code Ann § 19-6-19; Ill Ann Stats, ch 40, § 510 [b]; La Civ Code Ann art 160; Okla Stats Ann, tit 12, § 1289 [D]; Pa Stats Ann, tit 23, § 507; Tenn Code Ann § 36-5-101 [a] [3]; Utah Code Ann § 30-3-5 [6]). These statutes vary substantially in their requirements and effects. Some automatically terminate alimony upon proof of cohabitation (La, Ill, Pa), while others allow modification instead of termination (Cal, Conn, Ga, Okla, Tenn). In some States proof of cohabitation and proof of changed financial circumstances are necessary to warrant alimony modification (Cal, Conn, Tenn) and in two States (Cal, Tenn) proof of cohabitation creates a rebuttable presumption that financial circumstances have changed (see, Note, Alimony, Cohabitation and the Wages of Sin: A Statutory Analysis, 33 Ala L Rev 577 [1982]; Note, Alimony Modification and Cohabitation in North Carolina, 63 NC L Rev 794 [1985]).
The courts of these States passing anticohabitation statutes have uniformly dismissed constitutional attacks launched against them (see, Ivey v Ivey, 378 So 2d 1151 [Ala Civ App 1979] [equal protection attack dismissed]; Sims v Sims, 245 Ga 680, 266 SE2d 493 [1980] [equal protection and due process *896 challenges dismissed based on State’s interest in the institution of marriage]; Morris v Morris, 244 Ga 120, 259 SE2d 65 [1979]; Roberts v Roberts, 657 P2d 153 [Okla 1983]). In New York, constitutional challenges have either been dismissed or not entertained (Matter of Hall v Hall, 82 Misc 2d 814 [Fam Ct, Schenectady County 1975], affd 55 AD2d 752 [3d Dept 1976] [constitutional challenge rejected because court can rationally distinguish between persons merely living together in temporary liaison and those living in a more permanent relationship as described in the statute]; Waddey v Waddey, 290 NY 251 [1943] [statute found prospective only and due process challenge not entertained]; Gallin v Gallin, Sup Ct, NY County, Mar. 10, 1977, No. 33710/74 [unconstitutionality argument not reached]; Matter of Wood v Wood, 104 Misc 2d 109 [Fam Ct, Queens County 1980] [Domestic Relations Law § 248 equally available to a wife to bar support of a husband proven to be living with another woman and holding himself as married to her; statute may be construed as gender neutral to preserve its constitutionality]; Note, Alimony Modification: Cohabitation of Ex-Wife with Another Man, 7 Hofstra L Rev 471 [1979]).
The success of a constitutional challenge to New York’s termination-of-alimony statute on equal protection grounds will depend on the level of scrutiny the reviewing court chooses to apply to the classification established by the statute. In recent years, the United States Supreme Court has employed a two-tier analysis of statutory classifications. The equal protection clause of the 14th Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws” (US Const, 14th Amend, § 1) which is essentially a direction that all persons similarly situated should be treated alike (Plyler v Doe, 457 US 202, 216 [1982]). Section 5 of the Amendment empowers Congress to enforce this mandate, but absent controlling congressional direction, the courts have themselves devised standards for determining the validity of State legislation or other official action that is challenged as denying equal protection. The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate State interest (City of Cleburne v Cleburne Living Center, 473 US —, 105 S Ct 3249 [1985]; Schweiker v Wilson, 450 US 221, 230 [1981]; Vance v Bradley, 440 US 93, 97 [1979]; New Orleans v Dukes, 427 US 297, 303 [1976]). When social or economic legislation is at *897 issue, the equal protection clause allows the States wide latitude (United States R. R. Retirement Bd. v Fritz, 449 US 166, 174 [1980]) and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes (City of Cleburne v Cleburne Living Center, 473 US, at p —, 105 S Ct, at p 3254).
The general rule gives way, however, when a statute classifies by race, alienage or national origin. These factors are so seldom relevant to the achievement of any legitimate State interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy — a view that those in the burdened class are not as worthy or deserving as others. For these reasons and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling State interest (McLaughlin v Florida, 379 US 184, 192 [1964]; Graham v Richardson, 403 US 365 [1971]). Similar oversight by the courts is due when State laws impinge on personal rights protected by the Constitution (Kramer v Union School Dist., 395 US 621 [1969]; Skinner v Oklahoma, 316 US 535 [1942]).
Legislative classifications based on gender also call for a heightened standard of review. That factor generally provides no sensible ground for differential treatment. A gender classification fails unless it is substantially related to a sufficiently important governmental interest (Mississippi Univ. for Women v Hogan, 458 US 718 [1982]; Craig v Boren, 429 US 190 [1976]). Where individuals in a group have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our Federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how and to what extent those interests should be pursued. In such cases, the equal protection clause requires only a rational means to serve a legitimate end (Massachusetts Bd. of Retirement v Murgia, 427 US 307 [1976]). In the absence of a suspect class or fundamental interest, the court simply requires that the statute in question be a rational means to a legitimate State objective (Vance v Bradley, supra; New Orleans v Dukes, supra). In a number of cases the court has scrutinized classifications based on sex using an intermediate standard (see, Note, Alimony Modification: Cohabitation of Ex-wife with Another Man, 7 Hofstra L Rev 471, 496, n 171). *898 The court will, therefore, analyze Domestic Relations Law § 248 under each of the three standards of review.
For purposes of equal protection, fundamental rights are those rights explicitly or implicitly protected by the Constitution (San Antonio School Dist. v Rodriguez, 411 US 1 [1973]). Although the court in Rodriguez did not offer guidelines as to when a right would be deemed implicitly protected by the Constitution, it has yet to expand those rights which had been identified as fundamental prior to Rodriguez, i.e., an individual’s right to vote, to obtain a criminal appeal, or to travel. The Supreme Court has not yet recognized a fundamental interest in cohabiting or living openly with a member of the opposite sex, although the Supreme Court’s recognition of a right of privacy in the penumbras of the Bill of Rights (Griswold v Connecticut, 381 US 479 [1965]; Roe v Wade, 410 US 113 [1973], reh denied 410 US 959 [1973]; see, Doe v Commonwealth’s Attorney, 403 F Supp 1199 [US Dist Ct, ED Va 1975], affd mem 425 US 901 [1976], reh denied 425 US 985 [1976]) and expansion of the privacy right protections to unmarried individuals (see, Eisenstadt v Baird, 405 US 438 [1972]) has been characterized by one commentator as recognition of a right to "freedom of intimate association.” (See, Karst, The Freedom of Intimate Association, 89 Yale LJ 624 [1980]; see also, Note, The Constitutional Status of Sexual Orientation: Homosexuality as a Suspect Classification, 98 Harv L Rev 1285 [1985]; People v Onofre, 51 NY2d 476 [1980], cert denied 451 US 987 [1981]; People v Uplinger, 58 NY2d 936 [1983], cert dismissed 467 US 246.) Whether constitutional rights are infringed in sexual preference cases, and whether some compelling State interest can be advanced to permit their infringement, are important questions that the Supreme Court has, to date, not resolved, and which have left the lower courts in some disarray (Rowland v Mad Riv. Local School Dist., — US —, 105 S Ct 1373, 1377, 1378, n 9 [Brennan,, J„ dissenting 1985]; People v Onofre, 51 NY2d 476, 503 [Gabrielli, J., dissenting opn 1980], supra; cf. Carey v Population Servs. Intl, 431 US 678, 688, n 5, 694, n 17 [1977]). Nevertheless, this court is not prepared to rule that the right of a person to cohabit with another and hold themselves out to be that other person’s spouse is a fundamental right which would trigger a "strict scrutiny” standard of review.
The second strand of equal protection analysis which has evoked strict judicial scrutiny has focused on the nature of the class affected. The Supreme Court has struck down legislation *899 which draws lines on the basis of membership in certain suspect classes unless the State has shown that the statute furthers a compelling State interest. Implicit in the idea that particular classifications are suspect is a recognition by the court that certain "discrete and insular minorities” may need judicial protection from the adverse effects of a majoritarian political system (Note, Alternative Models of Equal Protection Analysis: Plyler v Doe, 24 BC L Rev 1363, 1373, n 106 [1983]). Under the Warren court, suspect classes included groups defined on the basis of race (Loving v Virginia, 388 US 1 [1967]; Korematsu v United States, 323 US 214 [1944], reh denied 324 US 885 [1945]), alienage (Graham v Richardson, 403 US 365 [1971], supra,) and national origin (Hernandez v Texas, 347 US 475 [1954]) and perhaps, the poor (Gunther, The Supreme Court, 1971 Term-Forward: In Search of an Evolving Doctrine on a Changing Court: A Model for a New Equal Protection, 86 Harv L Rev 1 [1972]). While the Burger court initially identified a class based on gender as inherently suspect (Frontiero v Richardson, 411 US 677 [1973]) later decisions have not subjected gender-based classifications to strict scrutiny (see, e.g., Michael M. v Sonoma County Superior Ct., 450 US 464 [1981]; Craig v Boren, 429 US 190, supra; see also, Massachusetts Bd. of Retirement v Murgia, 427 US 307, 318-319 [Marshall, J., dissenting opn 1976], supra ["(The court) has apparently lost interest in recognizing further 'fundamental’ rights and 'suspect’ classes”]).
Accordingly, the court holds that the right to cohabit and assert a status as a married individual is not a fundamental right and such cohabiting persons are not a suspect class triggering a review of the subject statute under the "strict scrutiny” doctrine and, accordingly, any constitutional challenge on this basis must fall. The court notes that recent decisional law has enunciated the principle that Domestic Relations Law § 248 may be construed as gender neutral in order to preserve its constitutionality (Matter of Wood v Wood, supra).
In the absence of a fundamental interest or a suspect class, courts have traditionally simply required that the statute be a rational means to a legitimate State objective. The legislative history surrounding Domestic Relations Law § 248 and its predecessor (Civ Prac Act § 1159, as amended by L 1938, ch 161) has been set forth fully in Citron v Citron (91 Misc 2d 785 [Sup Ct, Nassau County 1977], supra). The legislative intent, as gleaned from a reading thereof, was to "rectify a situation *900 where an ex-wife was receiving alimony while she was being accepted by society as another man’s wife.” (91 Misc 2d 785, 792, supra.) Immorality, as evidenced by habitual living together was not the legislators’ focal point. Domestic Relations Law § 248, by its very language, speaks in discretionary and not mandatory terms. Furthermore, discretion is granted to the court under the statute to apply it as the circumstances in each individual case requires. While the statute is couched in terms of either annulling an award of maintenance or keeping it intact, the grant of discretion in this portion of Domestic Relations Law § 248, together with the general legislative policy embodied in Domestic Relations Law § 236 (A) and (B) permits the court to take a flexible approach in the determination and to modify rather than annul previously awarded alimony so as to fit the determination to the circumstances of the case and the respective parties (Matter of Hall v Hall, 82 Misc 2d 814, supra). Accordingly, given the discretionary language of the statute, the absence of total termination of support in each case and the fact that the statute serves as a rational means to a legitimate State objective, a constitutional challenge to the statute on the basis of the "rational basis” standard must, likewise, fall.
The two-tier approach to equal protection analysis has recently met widespread dissatisfaction (see, Massachusetts Bd. of Retirement v Murgia, supra [Marshall, J., dissenting opn]; Dandridge v Williams, 397 US 471, 519-520 [Marshall, J., dissenting opn 1970]). The court has expressly extended an intermediate level of scrutiny to some legislative classifications such as those based on gender (Craig v Boren, supra) or illegitimacy (Trimble v Gordon, 430 US 762 [1977]). In Craig v Boren, Justice Powell expressly acknowledged that classifications based on gender evoke a standard of review more sharply focused than the normally deferential rational basis standard, but less demanding than the strict scrutiny standard (429 US 190, 210-211 [Powell, J., concurring opn]). The court noted that classifications based on gender generally are the product of "archaic and overbroad generalizations” about the proper roles of men and women. To withstand the constitutional challenge, the court held, such classifications must serve "important governmental objectives” and be "substantially related” to those objectives (429 US 190, 197). Despite the growing body of precedent employing an intermediate standard of review, the court has applied that standard erratically and has not articulated a principled theory of when such *901 intermediate scrutiny will be considered appropriate. Professor Tribe has suggested that intermediate level scrutiny is triggered when important, though not fundamental, rights are at stake, or when sensitive, though not suspect, classifications are employed (Tribe, American Constitutional Law § 16-3 [1978]). Increasingly, in an attempt to formulate uniform principles of equal protection review, commentators have discussed the court’s analysis in terms of a balancing of the competing individual and governmental interests (Wilkinson, The Supreme Court, the Equal Protection Clause, and the Three Faces of Constitutional Equality, 61 Va L Rev 945 [1975]; Note, Alternative Models of Equal Protection Analysis: Plyler v Doe, 24 BC L Rev 1363, 1381 [1983]). In Plyler v Doe (supra), Justice Brennan stated that for purposes of intermediate standards of review, a statute could be considered rational if it furthered a "substantial state interest” (457 US 202, 230 [1982]). A recent and most scholarly note has, for purposes of an intermediate standard of review, suggested a five-factor balancing model which encompasses all the factors the court has relied on in past equal protection decisions (Note, Alternative Models, op. cit., at 1393). The five-factor model would weigh (1) the nature of the class burdened, (2) the importance of the individual interest burdened, and (3) the extent to which the interest is burdened, against (4) the importance of the governmental interest asserted, and (5) the fit between the means selected and the ends sought.
As noted therein, the functioning of the proposed five-factor balancing model can be illustrated by examining two equal protection decisions whose results would be difficult to reconcile under traditional equal protection theories. Trimble v Gordon (430 US 762 [1977], supra) and Lalli v Lalli (439 US 259 [1978]) both involved equal protection challenges to State statutes that limited the ability of illegitimates to inherit by intestate succession from their fathers’ estates. In Trimble, the State required that illegitimate children seeking to claim under their fathers’ estates have been legitimated by the intermarriage of their parents. In Lalli, the State required that illegitimates who claimed under their fathers’ estates have had their paternity decided in a judicial proceeding prior to the father’s death. Although the statutes in question were similar, when analyzed in terms of the balancing method suggested above, the results of the two cases are not inconsistent. In both statutes, the nature of the class discriminated against — illegitimates; the importance of the State’s interest— *902 assuring the orderly disposition of estates; and the importance of the individual’s interest — the right to inherit, were identical. In Lalli, however, the challenged statute placed less of a burden on illegitimates claiming under their fathers’ estates than did the statute in Trimble. Moreover, the statute in Lalli, because it excluded fewer illegitimate children who could otherwise present a claim without jeopardizing the orderly administration of estates, was more closely related to the State’s interest than in Trimble. The lessening of the burden imposed on the class in Lalli, combined with the closer fit between statutory means and ends, could be seen as sufficient to shift the equal protection balance in favor of the State.
Contrasting New York’s statute (Domestic Relations Law §248) with those of Illinois (Ill Ann Stats, ch 40, § 510 [b] [alimony terminated for cohabitation "on a resident, continuing conjugal basis”]), Louisiana (La Civ Code Ann art 160 [alimony "shall be revoked if it becomes unnecessary and terminates if the (recipient) remarries or enters into open concubinage”]) and Pennsylvania (Pa Stats Ann, tit 23, § 507 [alimony barred by cohabitation]) provides another example of the balancing factor method. In all four statutes, the nature of the class discriminated against — divorced spouses receiving support and cohabiting with another person of the opposite sex (POSSLQ, supra); the importance of the State’s interest — a combination of such factors as punishment for postdivorce sexual activities, that cohabitation is a form of de facto remarriage, or relieving the payor spouse of his support obligation where his or her ex-spouse is being supported by another (Note, Alimony Modification and Cohabitation in North Carolina, 63 NC L Rev 794, 797 [1985]; Citron v Citron, supra) and the importance of the State’s interest — the right to receive alimony or maintenance, are identical. In New York, however, the challenged statute places less of a burden on ex-spouses wishing to continue to receive alimony or maintenance in such situations than do Illinois, Louisiana or Pennsylvania. The New York statute has been construed as gender neutral (Matter of Wood v Wood, supra), and speaks in discretionary and nonfatal terms (Matter of Hall v Hall, supra). Thus, the court holds, the lessening of the burden imposed on the class is contemplated by New York’s Domestic Relations Law § 248, combined with the closer fit between statutory means and ends, is sufficient to shift the equal protection balance in favor of the State, and, accordingly, Domestic *903 Relations Law § 248 is constitutional even under the "balancing of factors” standard of review.
Despite the statute’s constitutionality, it is a very unpopular and, in view of the broad discretionary powers conferred by other provisions of the Domestic Relations Law (Domestic Relations Law § 236 [A], [B]), unnecessary law (7 Hofstra L Rev 471, 496-497 [1979]; Note, Fam L Rev 1 [Dec. 1977]). Alimony or maintenance modification should be based on economic, rather than moral factors (see, Foster & Freed, Family Law, 29 Syracuse L Rev 569, 584 [1978]; address by Paula S. Seider, Esq., New York State Bar Assn. [Dec. 12, 1985]; see also, Wadlington, Sexual Relations after Separation or Divorce: The New Morality and the Old and New Divorce Laws, 63 Va L Rev 249, 265-272 [1977]). In his powerful dissenting opinion in Northrup v Northrup (supra) Judge Wachtler held that the majority virtually nullified the statute since unmarried couples rarely hold themselves out as married: "Today’s decision leaves the courts powerless to relieve the former husband of the obligation of subsidizing his former wife’s affairs no matter how unfair this may be under the circumstances. It is hard to imagine that the Legislature ever intended such a grotesque result” (43 NY2d 566, 573 [Wachtler, J., dissenting opn], supra). This court could not agree more. The court is also aware of the various proposals to the Legislature which would modify Domestic Relations Law § 248 (see, Note, Alimony Modification: Cohabitation of Ex-Wife with Another Man, 7 Hofstra L Rev 471, 490-494 [1979]; Assembly Bill 1824, 1985-1986 Regular Sessions [sponsored by Assemblyman Hevesi]).
Accordingly, the court exhorts the Legislature to resolve this dilemma as resolution must be accomplished by legislative fiat and not by judicial decision.