OPINION OF THE COURT
Gerald Lebovits, J.
In April 2008, the housing court CPLR article 12 guardian ad litem (GAL) of respondent, Feng Chai Lin, entered into a stipulation to settle this holdover proceeding. The stipulation provided that respondent would vacate by July 31, 2008, in return for some money. Respondent, now represented by counsel and with the help of a new GAL, moves to vacate the April 2008 stipulation. After a hearing, this court finds that respondent never agreed to the settlement. The issue in this case is whether a housing court GAL who believes that a ward’s best interests are served in consenting to a settlement forfeiting the ward’s apartment may consent on the ward’s behalf to a final judgment to compel the ward to vacate the premises when the ward herself opposes the settlement.
Facts and Procedural History
Fing Qing Lin, respondent’s sister, was the sole record tenant at 38 West 31st Street, units 452-453, in New York County. She allegedly sublet the units, two adjoining rent-stabilized single-room occupancy apartments, to respondent (Feng Chai Lin), Ying E. Lin, and Xiu Hang Lui in 2001 and moved to Boston in 2004. In 2005, petitioner filed this alleged illegal sublet holdover proceeding against the parties named above for violating Rent Stabilization Code (9 NYCRR) § 2524.3 (a) and § 2525.6. Fing Qing Lin, Ying E. Lin, and Xiu Hang Lui have since vacated the premises. This opinion addresses only respondent Feng Chai Lin, currently the units’ only occupant.
On April 15, 2005, Fing Qing Lin, Ying E. Lin, Feng Chai Lin, and Xiu Hang Lui, unrepresented by counsel, signed a stipulation in which Fing Qing Lin relinquished all claims to the premises after representing that she had permanently vacated the units in 2004. Respondent, who did not speak English, asserted a succession claim to the units through a Mandarin interpreter the court provided.
In October 2007, this court received a letter from a community mental health clinic stating that respondent suffers *478 from schizoaffective disorder. The court ordered Adult Protective Services (APS), a Department of Social Services agency that serves and supports physically and mentally impaired adults at risk of harm (see Human Resources Administration, Adult Protective Services, available at http://www.nyc.gov/html/ hra/html/directory/adult.shtml [last accessed July 14, 2009]), to evaluate respondent to determine whether she required a GAL’s assistance in this proceeding. Finding that respondent’s illness qualified her as an adult incapable of adequately asserting her rights, this court, with her consent, appointed a GAL for her under CPLR 1201.
In April 2008, petitioner moved for a summary judgment on the ground that the facts respondent alleged did not support her succession claim. During oral argument on the motion, this court discovered that respondent was not proficient in Mandarin and needed a Fuzhou interpreter. The court adjourned oral argument until a Fuzhou interpreter could appear.
On the adjournment date, petitioner, respondent, and a Fuzhou interpreter appeared. Oral argument on the summary judgment motion continued. At some point, the parties went into the court’s conference room to discuss settlement. Afterward, the GAL and petitioner’s counsel told the court that respondent wanted to settle. On the following day, April 28, 2008, petitioner came to court with a stipulation of settlement. Respondent herself did not appear. The GAL signed the stipulation on respondent’s behalf and again told the court that respondent, her ward, consented to vacating the apartment. The court approved this agreement, in which respondent agreed to surrender the premises by July 31, 2008. In exchange, petitioner agreed to waive three months’ use and occupancy and to pay $4,200 to respondent if she vacated the units timely.
About three months later, respondent, now represented by counsel, moved to vacate the stipulation. Respondent argues that she never allowed her GAL to agree to her vacating the units. The court held a hearing to decide whether respondent had consented to the April 2008 stipulation. In light of a possible conflict between the GAL and respondent, the court relieved the GAL and assigned Henry Bubel, Esq. as the new GAL.
Respondent and her former GAL testified at the hearing. Respondent testified credibly that she always told her GAL that she wanted to stay in the units and that she never agreed to move. She also testified that she is severely afflicted by major *479 depression. The GAL testified that she thought, but was not certain, that respondent had agreed to the terms of the stipulation and that she believed it was in respondent’s best interest to accept the deal. Given that respondent never signed the April 2008 stipulation, that the court did not allocute her about the stipulation’s contents, that she did not speak English and the former GAL did not speak Mandarin or Fuzhou, that she had the wrong interpreter for three years, that she was unrepresented by counsel, that she suffers from a mental illness, and that the GAL was uncertain about whether respondent wanted the settlement offer, this court finds that she had never consented to move.
The issue now is whether the court, having found that respondent never agreed to vacate the units, should grant respondent’s motion to vacate the April 2008 agreement the GAL entered into. This issue raises a dilemma: whether to allow an incapacitated ward to exercise her right to self-determination by making what some might identify as a foolish choice. On the one hand, the court considers the paternalistic notion that respondent, as an incapacitated adult, is incapable of making decisions in her best interest and that her guardian should be permitted to decide for her. On the other hand, the court weighs the importance of respondent’s liberty and her fundamental right to do with her property as her free will dictates. In deciding between these two, this court finds that deeming people less-than-capable of adequately defending themselves in a proceeding is no basis to permit the state or a guardian to make decisions for them. Preserving respondent’s right of self-determination takes precedence over enforcing what the GAL determined to be in her best interests. Only when litigants are so incapacitated that Supreme Court deems them judicially incompetent may the state take away their liberty and place it in the hands of a guardian appointed to handle the litigant’s affairs comprehensively — a Mental Hygiene Law article 81 guardian.
A housing court GAL may not enter into a settlement forfeiting a ward’s property against the ward’s wishes. Compared to Mental Hygiene Law article 81, CPLR article 12 is less demanding in terms of procedures and standards to appoint guardians, judicial approval for guardians to settle on their wards’ behalf, and monitoring standards for guardians’ activities. Article 81 guardians have the authority to enter their wards into a settlement against their will. Article 81 has stringent appointment *480 and monitoring procedures that justify granting the power to guardians. Article 12 guardians, who undergo less scrutinizing appointment procedures than article 81 guardians, have no authority to force a nonconsenting ward to forfeit property rights.
Granting respondent’s article 12 GAL the ability to force a settlement to vacate her home violated her due process rights. Accordingly, the April 2008 stipulation is vacated.
Legislative History of CPLR Article 12 and Mental Hygiene Law Article 81
Adopted in 1963, CPLR article 12 is the successor to Civil Practice Act §§ 202, 203, 207 and 208. CPLR 1201 authorizes courts to appoint guardians ad litem, the replacement of the Civil Practice Act’s “special guardians.” (See Legislative Studies and Reports, reprinted following McKinney’s Cons Laws of NY, Book 7B, CPLR 1202, at 322 [“The use of the term ‘special guardian’ is abolished”].) The Civil Practice Act’s special guardians had played a superfluous role. Infants or persons judicially declared incompetent often had general guardians to oversee their property. When infants or incompetents were parties to an action or proceeding, a court would appoint Civil Practice Act special guardians to appear on their behalf, even though they already had permanent general guardians. Deeming the appointment of two guardians for one ward a waste of resources, the Legislature enacted CPLR 1201, which replaced Civil Practice Act §§ 202 and 203. Only if the ward’s permanent guardian or committee (the predecessor to an article 81 guardian) has a conflict of interest does CPLR 1201 authorize courts to appoint guardians ad litem for infants or adjudicated incompetents. In addition, CPLR 1201 authorizes courts to appoint a guardian ad litem for an adult “incapable of adequately prosecuting or defending his rights.”
Mental Hygiene Law article 81 establishes a guardianship with greater powers than an article 12 guardianship. (See New York Life Ins. Co. v V.K., 184 Misc 2d 727, 732 [Civ Ct, NY County 1999] [“Appointment of a guardian ad litem is a far less restrictive intervention than ... (a Mental Hygiene Law) guardianship”].) Enacted in 1993, Mental Hygiene Law article 81 is designed “to promote the public welfare by establishing a guardianship system which is appropriate to satisfy either personal or property management needs of an incapacitated person in a manner tailored to the individual needs of that person.” (Mental Hygiene Law § 81.01.) The predecessors to *481 article 81 were former Mental Hygiene Law articles 77 and 78, which established conservatorship and committee laws. (Rose Mary Bailly, Practice Commentaries, McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.01, at 7.) The Legislature found that the “system of conservatorship . . . frequently is insufficient to provide necessary [relief, while on] the other hand, a committee . . . traditionally involves a deprivation that is often excessive and unnecessary.” (Mental Hygiene Law § 81.01.)
To assure that guardians would not have too much or too little authority over their wards, the Legislature established Mental Hygiene Law article 81 to create a guardianship that would “provide the necessary flexibility to meet [the ward’s] needs.” (Id.) An article 81 guardian can exercise powers as narrow as that of a conservator or as wide as that of a committee, whose ward, upon appointment, sustains a “judicial finding of incompetence and the . . . loss of civil rights.” (Mental Hygiene Law § 81.01; accord Matter of Lambrigger, NYLJ, May 31, 1994, at 37, cols 1, 2 [Sup Ct, Suffolk County 1994] [declining to grant petitioner’s motion to appoint for Lambrigger, an alleged but not adjudicated incompetent, a Mental Hygiene Law guardian with “the power to renounce or disclaim on behalf of (the ward) any interest, by testate or (intestate) succession, she may have” and stating that more appropriate than appointing an article 81 guardian “is the appointment of a (GAL who) . . . shall not be imbued with the power to substitute any decision or judgment as to property management or personal needs for (the ward)”].)
The Legislature promulgated CPLR article 12 so that GALs could help protect their wards’ rights for the action or proceeding, but only in a temporary and limited capacity. If article 12 guardians could acquire as much power over their wards as article 81 guardians could, then the two guardianships would be indistinguishable. There would have been little reason for the Legislature to create one guardianship, only to create an identical one 30 years later. Supposing that article 12 guardians share article 81 guardians’ power to reject a ward’s protests in settling a claim, no court would subject itself and the ward to the lengthy and tedious process of an article 81 guardian appointment when the same outcome could be had in a fraction of the time by a GAL appointment. To avoid reading the article 81 guardian as a mere duplicate of the article 12 guardian, this court distinguishes the powers and responsibilities of the two guardianships.
*482 Limitations on Guardianships
Courts must limit a guardianship’s authority and scope in accordance with the language of the statute providing the appointment mechanism. Courts should grant guardians no more power than necessary to assist their wards. (See Mental Hygiene Law § 81.02 [a] [2] [“Any guardian appointed under this article shall be granted only those powers which are necessary to provide for personal needs and/or property management of the incapacitated person in such a manner as appropriate to the individual and which shall constitute the least restrictive form of intervention”]; Andrew Scherer, Residential Landlord Tenant Law in New York § 7:119 [“The decision-making ability of the guardian ad litem is limited to the legal proceeding in which the guardian is appointed”]; Eve Preminger et al., Trusts and Estates Practice in New York § 14:18, at 14-10 [West’s NY Prac Series, vol E, 2001] [stating that Surrogate’s Court Procedure Act guardian has powers limited to those enumerated in SCPA 1723].) In the sense that their powers are limited, article 12 guardians are no different from other guardians. Courts must restrict the powers of an article 12 GAL so that the guardian has no more power than necessary to help the ward.
The Legislature enacted CPLR article 12 to create a limited, guardianship. The “ad litem” in guardian ad litem means “for the suit.” (Black’s Law Dictionary 46 [8th ed 2004].) By definition, an article 12 guardianship is confined to the case pending in court. It follows that GALs are temporary officers of the court for the duration of an action or proceeding. Their duty is to protect the rights and interests of wards who, by virtue of a court’s appointing the GAL, are deemed incapable of adequately protecting their rights and interests on their own. Although New York courts have not yet defined the exact parameters of an article 12 guardian’s authority, it is universally accepted that their powers are limited. (E.g. Jeanette Zelhof, Andrew Goldberg and Hina Shamsi, Protecting the Rights of Litigants With Diminished Capacity in the New York City Housing Courts, 3 Cardozo Pub L Pol’y & Ethics J 733, 762 [2006] [“New York jurisprudence has long been clear that the powers of a guardian ad litem are limited by law and the instructions of the court by which he or she is appointed”].)
Article 12 Guardian Appointment Standards
The procedural and evidentiary standards to appoint a housing court GAL are insufficient to grant the guardian the power to force a settlement that forfeits a ward’s property rights. *483 Comparing the higher standards required to appoint Mental Hygiene Law article 81 guardians to those required to appoint CPLR article 12 guardians highlights the relatively minimal standards needed to appoint an article 12 GAL.
One distinction between appointing article 12 guardians and article 81 guardians is the different jurisdictional requirements in appointing the guardian. In New York City, only Supreme Court has the authority to establish an article 81 guardianship. (Mental Hygiene Law § 81.04 [a] [“If . . . it is determined that relief under this article is necessary, the supreme court, and the county courts outside the city of New York, shall have the power to provide the relief set forth in this article”].) Lower courts, such as the New York City Housing Court, do not have the jurisdiction to appoint an article 81 guardian. Housing court can, however, appoint CPLR article 12 GALs. (See CPLR 1202 [a] [providing that a CPLR article 12 guardian may be appointed by any “court in which an action is triable ... at any stage in the action”].)
The burden of proof to appoint an article 12 guardian is lower than that needed to appoint an article 81 guardian. The burden to appoint an article 81 guardian is “clear and convincing evidence” (Mental Hygiene Law § 81.12 [a]), as opposed to the mere preponderance of evidence required for an article 12 guardianship. To appoint article 12 guardians, a court need determine only that, based on the state of the record, prospective wards are more likely than not incapable of adequately prosecuting or defending their rights. (See V.K., 184 Misc 2d at 734 [finding that court is justified in appointing GALs if preponderance of evidence in record demonstrates that prospective wards have conditions that impede their ability to protect their rights].) Before appointing an article 81 guardian, by contrast, Supreme Court “must undertake a detailed analysis, on the record, of the physical, mental, and financial health of the person alleged to be incapacitated.” (Matter of Wogelt, 223 AD2d 309, 313 [1st Dept 1996].) No comparable standard exists to appoint an article 12 guardian.
In addition to these procedural and evidentiary differences, the substantive appointment standards of the article 12 and article 81 guardians differ starkly. Article 12 wards do not need a judicial declaration of incompetence. Article 81 wards do. All that appointing article 12 guardians requires is for the court to find that, based on the record, adult prospective wards are unable adequately to help themselves in a judicial proceeding. (See *484 CPLR 1201.) The nature of the inadequacy is undefined. The ward’s incapacity might be cultural, linguistic, physical, intellectual, or psychological, to name a few.
Appointing article 81 guardians requires much more than the wards’ incapacities to defend their rights. Before the Supreme Court may appoint an article 81 guardian, the court must determine judicially that the ward is incompetent. To determine judicial incompetence, Supreme Court must conclude that the ward is likely to suffer harm because (1) the ward is unable to provide for personal needs or property management and (2) the ward cannot adequately understand and appreciate the nature and consequences of that inability. In reaching these determinations, Supreme Court must consider prospective wards’ functional levels, taking into account “preferences, wishes, and values with regard to managing the activities of daily living” (Mental Hygiene Law 81.02 § [c] [3]) and “understanding and appreciation of the nature and consequences of [their] functional limitations.” (Mental Hygiene Law § 81.02 [d] [2].) This judgment of incompetence is the prerequisite to transplanting the right to property from an individual to a guardian. Short of this drastic declaration by Supreme Court, the state may not establish an article 81 guardianship.
These differences between appointing article 12 and article 81 guardians exist for a reason. The standards to appoint an article 81 guardian are much higher than those for an article 12 guardian; the authority manifest in an article 81 guardianship can be as expansive as a court deems necessary to protect the ward’s rights, including the right to settle pending lawsuits on the ward’s behalf. Because an article 12 ward has not been judicially declared incompetent, the article 12 guardian does not have the unlimited powers of the article 81 guardian, whose ward has been declared incompetent. (See Bryant v Riddle, 259 AD2d 399, 399 [1st Dept 1999] [stating that individual’s status to sue or be sued remains the same as any other citizen until Supreme Court judicially declares individual incompetent]; Matter of Lugo, 8 AD2d 877, 877 [3d Dept 1959] [holding that even if respondent, an alleged incompetent, was an inmate of an institution for mentally unsound persons, she is not yet judicially incompetent and should be appointed a GAL to protect her rights and interests].)
In the present case, respondent underwent an APS psychological evaluation that revealed that she suffers from schizo-affective disorder. This court concluded from her disability alone *485 that she is incapable of adequately defending her rights in this holdover proceeding. Because petitioner and respondent consented to the GAL appointment, this court held no hearing or trial to determine her functionality and capability. To grant respondent’s GAL vast powers — specifically, the power to force her into giving up property rights against her will — would accord the guardian the powers of an article 81 guardianship after having administered only the process of an article 12 guardianship.
Some might argue that appointing a GAL is itself the very declaration of incapacity required to grant extensive rights to the guardian — that in appointing a GAL for respondent, the court manifested a judicial declaration of incompetence. But appointing a guardian ad litem does not amount to an adjudication of incompetence. (Anonymous v Anonymous, 3 AD2d 590, 594 [2d Dept 1957] [“The appointment of (a GAL) would ... in no way amount to an adjudication of incompetency but would merely be a determination of the fact that the state of the record indicates a necessity for the court to intervene for the party’s protection”].) Despite the appointment of a GAL, respondent retains and continues to retain the right to voice her wishes at every stage of the proceeding, “including the right to veto a settlement, unless and until she has been adjudicated an ‘incapacitated person.’ ” (Matter of Bernice B., 176 Misc 2d 550, 555 [Sur Ct, NY County 1998].) A finding of incapacity to appoint an article 12 GAL is “not the equivalent of the adjudicative process that the law requires in order to deny a party . . . her right to exercise a veto over a settlement that would be binding on her. An adjudication having such a consequence must arise from a process having the safeguards afforded under . . . Mental Hygiene Law [article 81].” (Id.)
Some might also argue that even if article 12 guardian appointment procedures are less demanding than article 81 guardian appointment procedures, article 12 nonetheless provides sufficient measures of due process to remove an incapacitated ward’s right to veto a settlement. After all, this argument contemplates, a preponderance of evidence must convince a court that a prospective ward is incapacitated. But differences arise between the amount of evidence and what evidence proves. Even assuming that the evidentiary requirements of article 12 suffice to prove that wards are incapable of adequately representing themselves in an action or proceeding, a finding of incapacity sheds little light on whether the wards are competent
*486 enough to choose to continue living in their home. That a prospective ward is afforded “evidentiary protection is, in and of itself, inadequate as a matter of due process if there is no relation between that which must be proved and the interference with liberty which the State then imposes.” (Matter of Fisher, 147 Misc 2d 329, 338 [Sup Ct, NY County 1989] [“(T)he finding that a person cannot handle her finances is simply inadequately related to a person’s ability to make other decisions about her life ... to deprive her of the right to make such decisions”].) The standard of proof required to appoint housing court GALs is that the wards are incapable of adequately defending themselves in a proceeding. The incapacity that must be proven to appoint an article 12 guardian is insufficiently related to the ward’s ability to decide whether to forfeit property.
When someone is so incapacitated that a court must appoint a guardian with powers over liberty and property, the ward must be judicially declared incompetent and assigned an article 81 guardian. Until the ward has been through the rigorous process of being appointed a Supreme Court article 81 guardian and has been declared judicially incompetent by Supreme Court, the ward’s right to self-determination remains intact.
Settlement Procedures
No statute enumerates the procedures for GALs to settle on behalf of their incapacitated adult wards. CPLR 1207 outlines the procedural steps to obtain judicial approval of a ward’s settlement for infants and persons judicially declared incompetent, but CPLR 1207 mentions nothing about incapacitated adults who have not been adjudged incompetent. By excluding “incapacitated adults” from the language of CPLR 1207, the Legislature expressed its desire not to grant article 12 GALs the authority to settle on an incapacitated adult’s behalf. (See Vincent C. Alexander, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR 1207, at 353 [“Only certain persons have standing to make a motion . . . for judicial approval of a ward’s settlement”]; accord DeSantis v Bruen, 165 Misc 2d 291, 295 [Sup Ct, Suffolk County 1995] [“(A) guardian ad litem appointed for an incapacitated adult party ... is the only CPLR 1201 representative who is not expressly authorized by statute to apply for court approval of a . . . compromise of . . . claims”].)
Without a statutory medium to settle on behalf of incapacitated adult wards, article 12 guardians may not cause incapacitated adult wards to enter into a settlement without the ward’s
*487 consent. (See Tudorov v Collazo, 215 AD2d 750, 750 [2d Dept 1995] [“(G)uardian ad litem is not authorized to apply to the court for approval of a proposed settlement of a party’s claim”]; Matter of Lainez, 11 Misc 3d 1092[A], 2006 NY Slip Op 50822[U], *3 [Sup Ct, Kings County 2006] [“(A CPLR article 12) guardian ad litem as opposed to an Article 81 Guardian also unnecessarily hinders a possible settlement of the action (because a) guardian ad litem is not authorized to apply to the court for approval of a proposed settlement ... as this is reserved to a guardian appointed pursuant to Article 81 of the Mental Hygiene Law”].) Even if an article 12 GAL has represented the incapacitated adult up to the date of settlement, “it will be necessary to effect substitution of a fiduciary with the appropriate credentials” (67 NY Jur 2d, Infants and Other Persons Under Legal Disability § 594, Comment), such as a Mental Hygiene Law article 81 guardian, before a settlement may be effected.
CPLR 1207 applies only to settling claims by infants and incompetent persons, not to claims against them. From that interpretation, someone might argue that an incapacitated adult ward’s GAL has no restriction to settle claims against a ward. But CPLR 3217 (a) (2) provides that parties may not stipulate to discontinue an action without a judicial order if any party is an infant or an incompetent person for whom a committee has been appointed. This provides the counterpart to CPLR 1207 for claims against a ward. A court’s permission is necessary to settle claims against an infant and incompetent as well as to settle claims brought by them.
The Legislature’s excluding “incapacitated adults” from the language of CPLR 1207 does not justify expanding an article 12 guardian’s powers to let the guardian override a ward’s wishes. Reading article 12 as allowing the GAL to amass the power to veto a ward’s desire misinterprets the statutory language. By leaving out “incapacitated adults” from CPLR 1207, the Legislature intended to limit a GAL’s authority over someone not judicially incompetent, not to give free reign to GALs to settle all claims against their wards. It is difficult to see how the Legislature would restrain a guardian’s powers when the ward is an infant or a judicially declared incompetent but remove all restrictions when the ward is someone with arguably greater functionality. The more capable the ward, the more limited the guardian’s powers over the ward should be. CPLR 1207 must be read to provide a way for guardians of infants and adjudged *488 incompetents to settle claims on their behalf, but not for guardians of incapacitated adults to settle on their wards’ behalf.
In 2007, the Board of Directors of the New York County Lawyers’ Association (NYCLA) approved a NYCLA committee report that argued that an article 12 GAL does not have the power to settle for an incapacitated adult ward without the ward’s consent. (See NY County Lawyers’ Assn, Report on Resources in the Housing Court, available at http://www.nycla.org/ siteFiles/Publications/Publications468_0.pdf [last visited July 6, 2009].) The NYCLA report states that if the ward and the GAL differ on whether or on what terms to settle, the housing court judge should refer the case for trial or an article 81 proceeding. (Id.) The NYCLA notes that housing court article 12 GALs are different from Mental Hygiene Law article 81 guardians, both in duty and power. (Id.) This court agrees.
Respondent is neither an infant nor an adjudged incompetent. She is an adult incapable of adequately defending her rights in a summary proceeding. Because CPLR 1207 does not apply to her, article 12 cannot be construed to grant her GAL the authority to consent on her behalf to a settlement that directs her vacatur from the apartment.
Monitoring Standards
Another reason a guardian’s authority must be limited is that CPLR article 12 does not require courts to supervise GALs. If appointing a GAL removes from a ward the power to make decisions and gives the GAL that power, the courts must ensure that GALs not abuse their power — that GALs exercise their power consistent with the limitations placed on their authority over the wards. The more authority guardians amass, the more closely the court must monitor their actions. But the Legislature has not codified CPLR article 12 to compel courts to supervise a GAL’s activities. This buttresses the view that the authority bestowed on an article 12 guardian is not extensive enough to merit the court’s supervision.
Although article 12 does not mention any monitoring standard to supervise GALs, Mental Hygiene Law article 81 enumerates multiple standards. Article 81 lists a guardian’s specific duties (Mental Hygiene Law § 81.20), including initial (Mental Hygiene Law § 81.30) and annual (Mental Hygiene Law § 81.31) reports the guardian must file with the court. Recognizing the vast authority that article 81 guardians potentially wield over their wards, the Legislature articulated each of these requirements to protect the wards’ rights and interests.
*489 This proceeding demonstrates the consequences of the lack of a statutory monitoring system for article 12 GALs. On the GAL’s report that respondent agreed to settle, the court approved the April 2008 stipulation. At the hearing to determine whether respondent had consented to the settlement, the GAL testified that she thought that respondent agreed to vacate the apartment but that she could not be sure. The court is uncertain how the GAL was able to communicate effectively with respondent, given that respondent had been assigned an interpreter for the wrong language for the majority of the guardianship and that the GAL had never told anyone about this problem. In light of these lax monitoring standards for an article 12 GAL, it is hard to conceive that the Legislature wanted to allocate to a GAL the authority to surrender a ward’s rights absent the ward’s consent.
Although there is no statutory monitoring system, other sources of guidance exist. An advisory notice offers courts instructions on how to monitor GALs. The New York City Civil Court’s 2007 Settlement of GAL Cases advisory notice provides a nonstatutory standard to monitor article 12 guardians. (See NY City Civ Ct, Settlement of GAL Cases [eff Mar. 8, 2007], available at http://www.nycourts.gov/courts/nyc/civil/directives/ AN/gal.pdf [last accessed June 29, 2009].) This beneficial advisory notice assures the integrity of the court proceeding. The notice provides that before the court approves and so-orders a stipulation settling a proceeding, the court should ascertain on the record that the GAL has at least (1) met with the ward; (2) determined the ward’s desires; (3) investigated and weighed all factors in recommending a settlement in the ward’s best interests; (4) developed a plan for assistance; (5) followed the plan; (6) informed the court whether the ward agrees or disagrees with settlement; and (7) taken all steps to bring the ward to court. (Id.) By requiring the GAL to carry out these seven steps, the court can prevent the ward’s rights and interests from being overlooked.
This court complied with the advisory notice, but doing so was not enough to protect respondent’s rights. Pertinent to this proceeding, the advisory notice does not state what the court should do if the guardian informs the court that the ward disagrees with settlement. Read in tandem, the seven steps imply that the ward’s consent is just one factor in a court’s decision to approve a stipulation of settlement signed by a GAL.
Despite their value and persuasive authority, moreover, advisory notices are just that: advisory. Advisory notices do not *490 carry the weight of a statute, such as Mental Hygiene Law article 81, the Legislature has approved and ratified. Advisory notices frame supervising judges’ opinions about how to best handle cases and should be followed whenever possible. But because they have no force of law, advisory notices do not bind judges. Thus, the Civil Court’s Settlement of GAL Cases advisory notice is not enough to compensate for the lack of a statutory monitoring standard so as to allow a GAL to override a ward’s wishes.
Right to Property
The right to veto a settlement forfeiting one’s property may not be denied with the sole process CPLR article 12 affords. The gravity and importance of a right correlates with the amount of due process owed to an individual whose right is at stake. (Cf. Mathews v Eldridge, 424 US 319, 341 [1976] [“(T)he degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any administrative decisionmaking process”]; accord Fisher, 147 Misc 2d at 340-341 [holding that GAL has no authority to limit ward’s liberty by forcing ward to accept home health care worker’s services].) The more basic and fundamental a right, the more stringent the process to nullify it must be.
The right to property is a fundamental right guaranteed by the United States and New York Constitutions. (US Const, 14th Amend, § 1 [“No State shall. . . deprive any person of life, liberty, or property, without due process of law”]; NY Const, art I, § 6 [“No person shall be deprived of life, liberty or property without due process of law”].) Before taking an individual’s property, “the State must provide effective procedures that guard against an erroneous deprivation” of the fundamental right to property. (People v David W., 95 NY2d 130, 136 [2000]; accord Mathews, 424 US at 333 [“(S)ome form of hearing is required before an individual is finally deprived of a property interest”].)
Until an article 81 guardian is appointed and Supreme Court enters the judicial declaration of incompetence to accompany that appointment, neither the state nor anyone else has any power or control over an individual’s property. (Finch v Goldstein, 245 NY 300, 303 [1927] [holding that an individual “remains in possession of his property” and is the only one who “can dispose of it” until a committee (now an article 81 guardian) is appointed]; Matter of Frank, 283 NY 106, 111 [1940] [finding that no court declared appellant incompetent and that *491 until appellant was judicially determined incompetent, her property would not be under Supreme Court’s jurisdiction].)
Guardians ad litem do not even have the power to compel their wards to allow cleaners to access the apartment in a Collyer case, a case in which a tenant suffers from a condition that induces a compulsion to hoard things to the point of public nuisance and sanitation concerns. (See Stratton Coop, v Fener, 211 AD2d 559 [1st Dept 1995] [affirming housing court’s decision to evict Collyer tenant on the ground, in part, that appointing a GAL for “the limited purpose of assisting with the clean-up . . . would (not) solve the problem of access to the apartment”].) If GALs do not have the authority to let people into a nonconsenting ward’s apartment, they cannot have the authority to consent to a final judgment compelling nonconsenting wards to leave their homes. Before a court or any of its officers, including GALs, may exercise jurisdiction over an individual’s property without the individual’s consent, Supreme Court must first find the ward incompetent.
Respondent’s property interest in the rent-stabilized single-room occupancy units exists in the form of a succession claim to a leasehold. (See East Four-Forty Assoc. v Ewell, 138 Misc 2d 235, 247 [App Term, 1st Dept 1988] [“Regulation of interests in real property, including regulation of leasehold interests, involves regulation of the most basic of property rights”].) Petitioner argues that because respondent did not have choate rights to the leasehold in April 2008, when the GAL signed the stipulation, there were no rights to give away. Yet the stipulation gave up not only potential rights to the leasehold but also the right to bring a claim to defend the leasehold. However defined, the right at stake was undeniably fundamental: either the right to property or the right to enter into or veto a settlement over personal property.
Notice to the Ward
In her dissenting opinion in Neilson v Colgate-Palmolive Co., Second Circuit Judge Sonia Sotomayor conveyed the idea that the due process afforded prospective wards in appointing a CPLR article 12 guardian is inadequate if the GAL has the power to settle wards’ claims. (199 F3d 642, 658-660 [2d Cir 1999, Sotomayor, J., dissenting].) The plaintiff in Neilson was a pro se litigant in a case in which District Court discovered that she had previously been involuntarily committed to psychiatric hospitals. District Court directed plaintiff to submit to a psychiatric examination. After hearing the results of the evaluation, *492 District Court appointed a GAL for her. Plaintiff originally acquiesced to the GAL appointment, believing that a guardian would provide mostly legal assistance. When the GAL entered into a settlement with defendant, the plaintiff appealed the appointment of the GAL.
The Neilson majority affirmed District Court’s approval of the settlement that plaintiffs guardian ad litem negotiated on her behalf. (Id. at 654 [“We do not find that the district court abused its discretion in determining that the settlement negotiated by (the GAL) was fair, reasonable, and adequate”].) The majority, however, did not directly rule on whether GALs have the authority to settle on a ward’s behalf under New York law. The majority, rather, acknowledged that the New York “rule provides that approval of a settlement must be sought by a general guardian rather than by a guardian ad litem.” (Id. at 656.) Without commenting on the soundness of New York law, the majority found that federal district courts are not bound by it. (Id. [“It is not clear that the limitation embodied in § 1207 relates to capacity. But assuming that it does, we conclude that the district court was not obliged to apply it” (citations omitted)].)
The GAL in Neilson overrode the plaintiffs wishes in managing her case. Judge Sotomayor wrote that District Court’s “informing Neilson that it was considering appointing a guardian ad litem [and] ordering an independent psychological examination [did not] even [approach] sufficient notice under the Due Process Clause” to appoint a GAL. (199 F3d at 659 [Sotomayor, J., dissenting].) Judge Sotomayor suggested that before a court may appoint a guardian with the authority to settle the plaintiffs claim, “the district court had the responsibility to provide Neilson with notice that was tailored to her mental capacity and designed to ensure that she understood the course her case was taking” (id. at 663), in addition to giving her notice that the “guardian . . . would have full control over the litigation.” (Id. at 661.)
This court defers to Judge Sotomayor’s reasoning, a contrapositive of this court’s holding. Judge Sotomayor starts with the notion that GALs have the power to settle their ward’s claims. Judge Sotomayor rationalizes that because guardians have comprehensive authority over their wards, courts must give wards more notice than a single psychological examination before appointing guardians who will dictate the course of their trial proceedings. This court starts with the notion that GALs *493 do not have the power to settle their ward’s claims. This court holds that the reason GALs lack this power is that the due process and notice afforded wards before courts appoint guardians for them is insufficient to grant GALs extensive power. Whether the argument is that notice is inadequate given guardians’ comprehensive power or that guardians cannot have too much power given the minimal notice afforded, the result is the same: sufficient notice to a prospective ward and the authority to deprive that ward of property rights cannot exist without the other.
The facts here are similar to those in Neilson. This court appointed a GAL for respondent after only a psychiatric evaluation. Respondent was never told that her agreeing to a GAL would mean that her GAL could make decisions on her behalf despite her wishes. Respondent did not understand what rights she might be giving up as a result of the GAL appointment. Because the court did not explain to respondent the authority that her GAL would have over her property, “not even the most diligent and capable guardian ad litem can compensate for an unlawful deprivation of [respondent’s] right to be fully informed before she loses control of her case.” (Id. at 662 [Sotomayor, J., dissenting].)
The Ward’s Best Interests
Petitioner argues that the settlement’s terms were in respondent’s best interests. Petitioner agreed to pay $4,200 and waive three months’ use and occupancy in exchange for one condition: that respondent vacate the units timely. Believing this to be respondent’s best option, the GAL accepted the settlement offer.
That the GAL acted in the ward’s best interests is a strong argument for petitioner. If article 12 wards are permitted to reject settlement offers and, instead, go to trial, the consequences could be dire. If the court finds the ward’s claims groundless, as they might be, the ward might be evicted. Anxious to have their day in court and handicapped by whatever incapacities plague them, article 12 wards might too quickly reject a settlement offer because they might lack the aptitude to consider options and fail to appreciate fully the possibility and aftermath of losing their case.
Take, for example, a nonpayment proceeding in which the ward wants to have a trial, believing that the court will grant a full rent abatement on the ground that the landlord bugged the ward’s brain with electromagnetic impulses from a microwave *494 oven across the street. Assume further that the GAL has secured funding from the Department of Social Services to pay all the arrears and that the landlord has agreed to adjourn the proceeding in return for respondent’s agreeing to sign a settlement to pay the arrears. If this ward goes to trial and does not get the abatement sought, all arrears will be due within five days after adjournment. (See RPAPL 747-a [“(I)n any non-payment summary proceeding in which . . . the petitioner has obtained a judgment . . . and more than five days has elapsed, the court shall not grant a stay of the issuance or execution of any warrant of eviction”].) The Social Services funding will be lost. Given their incapacitation, the argument goes, article 12 wards should not be trusted to make decisions about their property.
Attractive and noble as the argument championing the ward’s best interests might be, the heart of this argument comes down to this: incapacitated adults do not know better; we must decide for them. The suggestion that intelligent and reasonable people will act in the best interests of incapacitated adults audaciously assumes that a court has the power to allocate the rights of those incapacitated adults. Fundamental rights belong to the person and remain there unless the state has lawfully exercised a statutory means for their removal. Justifiable grounds to remove liberties from the individual might be incarceration, permanent vegetative state, or judicial incompetence under article 81, but not incapacity under article 12 to prosecute or defend one’s rights. Until the state deems people judicially incompetent, no court has the right to deprive them of their fundamental liberties.
The heart of contention between the GAL and the ward might, at times, be trite and immaterial to the ward’s basic rights and interests, such as deciding whether to adjourn to a Tuesday rather than a Wednesday. But this case is not about differences in individual opinions, preferences, and wishes. This case concerns the right to property and whether a housing court-appointed article 12 GAL may forfeit that right on a ward’s behalf. This court holds that a GAL may not do so.
Effects of Limitations on the GAL’s Power
Supporters of expanding article 12 guardians’ powers argue that not allowing GALs to enter into settlements for wards will tie the guardians’ hands and render them powerless. If the GAL cannot make a decision in the ward’s best interests, what differentiates a GAL from an attorney, whose job is to advocate on the client’s behalf? GALs, they argue, become unnecessary
*495 mouthpieces unless they are allowed to “step[ ] into the shoes of the ward” and decide for the ward. (Judith J. Gische, Guardian ad Litem Appointments in Civil Proceedings for Adults Incapable of Adequately Prosecuting or Defending Their Rights, 19 Westchester BJ 289, 290 [1992] [“The GAL steps into the shoes of the ward for the purpose of prosecuting or defending the particular action at hand”].)
Interpreting a guardian’s role as a decision maker misconstrues an article 12 guardianship’s true objective. Housing court appoints GALs to assist incapacitated adults, not to live the wards’ lives for them. (See Zelhof, Goldberg, and Shamsi at 762 [arguing that New York case law does not support the concept that GALs may “step() into the shoes” of wards].) An article 12 guardianship is not a decision-making position; it is an appointment of assistance. The GAL provides invaluable service to the ward, such as applying for public assistance or arranging cleanups for consenting Collyer wards. Better-versed with the ways of the world and its bureaucracy than wards are, GALs should try to help realize their wards’ wishes to the best of their judgment and abilities. As an officer of the court, the GAL also acts as a liaison among the court, the opposing side, and the ward, informing them of things that might help the ward’s case. Matter of Aho
Petitioner and others cite Matter of Aho (39 NY2d 241 [1976]) and Matter of Feliciano v Nielsen (290 AD2d 834 [3d Dept 2002]) as dispositive of whether a housing court guardian has the authority to force a ward to settle. Aho states that “a guardian ad litem may of necessity be obliged to act contrary to the desires of the incompetent and to adopt a position adverse to that urged by his ward.” (Aho, 39 NY2d at 247.) Feliciano, which relies on Aho, states that “a guardian ad litem is not to be viewed as an ‘unbiased protagonist of the wishes of an incompetent’ and may even act contrary to the wishes of its ward.” (Feliciano, 290 AD2d at 835, quoting Aho, 39 NY2d at 247.) Petitioner’s interpretation of Aho is not singular; some commentators have taken Aho to mean that “[although the ward’s desires are relevant, they are not determinative” and that “a guardian ad litem may have to act contrary to the ward’s desires and maintain a position adverse to the ward.” (E.g. Mark Finkelstein, Guardians Ad Litem in Housing Court, at 21 [2006] [unpublished outline].) On examination, blindly interpreting the Aho Court’s oft-quoted passages to mean that GALs may uncompromisingly override their wards’ wishes contradicts the Aho Court’s intentions.
*496 In Aho, the respondent was a woman in her 80s who had been adjudicated incompetent. Her attorneys appealed a Supreme Court decision that had declared her incompetent and denied her motion to change venue. Contesting the respondent’s attorney’s authority to bring the appeal, the petitioner argued that an adjudged incompetent loses the ability to have an attorney represent her. The Court of Appeals disagreed. The Court held that because a committee (former article 81 guardian) or the GAL might not “sedulously carry out the wishes of the incompetent person,” the attorney has the authority to represent a judicially declared incompetent. (Aho, 39 NY2d at 246.) It was in this context — to protect an adjudged incompetent’s rights and wishes — that the Court observed in dictum that a guardian may act contrary to a ward’s wishes. The Court of Appeals wanted to protect the rights and desires of a judicially declared incompetent, now an article 81 ward. The Court never suggested that article 12 GALs should carry out what they deem proper against the wards’ consent. To interpret Aho to mute the voice and rights of an article 12 ward, as have some outlines and a line of cases that depend on the Aho’s dictum, contradicts the Aho Court’s intent. This court rejects that secondary authority and line of cases as unpersuasive. Conclusion
When the State wishes to force individuals to give up their fundamental rights, it must effect certain procedures. If the State had met its burden of proof and convinced Supreme Court that respondent were so incapacitated that she required an article 81 guardianship, the article 81 guardian could have given up her property rights regardless whether she consented. That has not been the case here. Respondent seeks to invalidate the stipulation of settlement agreeing to vacate the units signed by her article 12 GAL because respondent had never consented to giving up her property. The forfeited rights of respondent, a CPLR article 12 ward, were disproportionate to the meager process afforded in appointing an article 12 GAL for her. To say that her article 12 GAL had the authority to surrender her property rights against her wishes displaces her rights without due process.
Respondent moves to vacate this April 2008 stipulation on the grounds that she never consented to forfeit her property rights and that a housing court-appointed GAL cannot give up *497 respondent’s property rights against her wishes. This court agrees. An article 12 GAL lacks the authority to forfeit a ward’s property rights without the ward’s consent, even when the GAL acts in the ward’s best interests.