M.B. v C.B. (2025 NY Slip Op 50789(U))

[*1]

M.B. v C.B.

2025 NY Slip Op 50789(U)

Decided on May 15, 2025

Supreme Court, Westchester County

Hyer, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on May 15, 2025
Supreme Court, Westchester County

M.B., Plaintiff,

against
C.B., Defendant.

Index No. XXXXX

Plaintiff - James J. Sexton, Esq., Law Offices of James J. Sexton, P.C., 301 North Main Street, Suite 1, New City, New Yok 10956
Defendant - Self-Represented

James L. Hyer, J.

The following Decision and Order is being entered following a conference before the undersigned held on May 14, 2025, wherein sua sponte the Court made a decision on the record appointing a guardian ad litem (hereinafter "GAL") for Defendant noting that a written decision would be entered therafter.
 Relevant Background and Procedural History
On April 9, 2025, this matrimonial action was commenced with the filing of a summons and complaint (NYSCEF Doc. # 1) (hereinafter "Complaint"), which asserts that the parties were married in June of 2017, and have three children being: (1) A.B. (D.O.B.: XX/XX/XXXX); (2) E.B. (D.O.B.: XX/XX/XXXX); and (3) J.B. (D.O.B.: XX/XX/XXXX) (hereinafter collectively "Children").
Notably, both Plaintiff and Defendant are attorneys licensed to practice law in the State of New York, and believed by this Court to be in good standing.
Filed with the Complaint as part of NYSCEF Doc. No. 1 was a Notice of Entry of Automatic Orders (hereinafter "Automatic Orders") which included the following directives:
"FAILURE TO COMPLY WITH THESE ORDERS MAY BE DEEMED A [*2]CONTEMPT OF COURT
PURSUANT TO the Uniform Rules of the Trial Courts, and DOMESTIC RELATIONS LAW § 236, Part B, Section 2, both you and your spouse (the parties) are bound by the following AUTOMATIC ORDERS, which have been entered against you and your spouse in your divorce action pursuant to 22 NYCRR §202.16(a), and which shall remain in full force and effect during the pendency of the action unless terminated, modified or amended by further order of the court or upon written agreement between the parties:
(1) ORDERED: Neither party shall transfer, encumber, assign, remove, withdraw or in any way dispose of, without the consent of the other party in writing, or by order of the court, any property (including, but not limited to, real estate, personal property, cash accounts, stocks, mutual funds, bank accounts, cars and boats) individually or jointly held by the parties, except in the usual course of business, for customary and usual household expenses or for reasonable attorney's fees in connection with this action.
* * *
(3) ORDERED: Neither party shall incur unreasonable debts hereafter, including, but not limited to further borrowing against any credit line secured by the family residence, further encumbrancing any assets, or unreasonably using credit cards or cash advances against credit cards, except in the usual course of business or for customary or usual household expenses, or for reasonable attorney's fees in connection with this action.
* * *
IMPORTANT NOTE: After service of the Summons with Notice or Summons and Complaint for divorce, if you or your spouse wishes to modify or dissolve the automatic orders, you must ask the court for approval to do so, or enter into a written modification agreement with your spouse duly signed and acknowledged before a notary public."
On April 9, 2025, a request for judicial intervention (NYSCEF Doc. Nos. 8-9) was filed with a motion filed by order to show cause (NYSCEF Doc. Nos. 2-7) (hereinafter "Motion Sequence No. 1") seeking the entry of an order: (1) granting Plaintiff interim sole legal and physical custody of the Children; (2) granting Plaintiff an order of protection in favor of Plaintiff and the Children against Defendant; and (3) granting Plaintiff interim exclusive occupancy of the parties' marital domicile.
In support of Motion Sequence No. 1, Plaintiff asserted that the deterioration of Defendant's mental condition required the immediate and extreme relief requested:
"As will be set forth in detail herein, the Defendant's mental health has deteriorated over the last several weeks to the point where, at the risk of hyperbole, it is beyond dispute that he is most likely an extreme danger to me, our three (3) young children and the community-at-large. I would note, at the outset, that although the allegations I make in this document may seem extreme and hyperbolic — every allegation I make regarding the Defendant's statements and behaviors is supported by audio recordings, video recordings or screenshots of text messages from the Defendant. The Court need not "take my word" for anything alleged herein. I am unclear what is happening to the Defendant right now — and whether his erratic and aggressive behavior is the result of a severe mental health [*3]issue, a substance abuse issue or some combination of the two.[FN1]
* * *
As will be set forth in detail herein, the Defendant has engaged in repeated acts of domestic violence / intimate partner abuse against me with increasing frequency and severity over the last several months including abuse in the direct presence of our young children and while the children were in the residence. The Defendant has also exponentially increased his abuse of cannabis and possibly other drugs — attempting as recently as this past weekend to interact with our children immediately after having smoked a significant amount of cannabis.[FN2]
* * *
The Defendant has routinely called me vile and profane names including, but not limited to: "cunt", "bitch", "retard", "fucking dirty bitch", "lazy fucking bitch", "ungrateful cunt", "fucking piece of fucking shit", "stupid fucking bitch", "retarded" and other similar term.[FN3]
* * *
The Defendant is also, in the last several weeks, increasingly paranoid, erratic and aggressive in his statements and demeanor, including specifically but not limited to: Posting "live streams" on TikTok and other social media applications during which he makes bizarre claims and grandiose statements often while smoking cannabis and walking through the streets of Manhattan.[FN4]
On April 9, 2025, Motion Sequence No. 1 was conformed (NYSCEF Doc. No. 11) directing: (1) by April 9, 2025, by 12:30 p.m., Plaintiff serve Defendant, via e-mail and text message, Motion Sequence No. 1; and (2) that the parties appear in person on April 9, 2025, at 2:30 p.m., for oral argument on the application wherein a briefing schedule would be set if needed.
On April 9, 2025, a conference was held wherein appearances were made in-person by Plaintiff and Plaintiff's counsel, and virtually by Defendant as a self-represented litigant at which time Defendant was advised of his right to be represented by counsel or appear as a self-represented litigant. Two documents were marked and filed as court exhibits, for which Plaintiff's counsel was directed to serve Defendant with by the end of that day: (1) Court Exhibit #1 — Self-Represented Litigant Information Sheet (NYSCEF Doc. No. 14); and (2) Court Exhibit #2 - Part Rules of the Hon. James L. Hyer, J.S.C. (NYSCEF Doc. No. 15).
Following oral argument, the Court entered a Decision and Order pertaining to Motion Sequence No. 1 (NYSCEF Doc. No. 13) (hereinafter "Decision") directing: (1) that due to a finding of exigent circumstances requiring immediate Court intervention prior to a hearing, [*4]pending a hearing to be held and further decision to be entered by this Court following the hearing, Plaintiff was granted all interim relief requested; and (2) that unless a fully executed stipulation was submitted pertaining to the relief sought in Motion Sequence No. 1 by April 11, 2025, a hearing would be held as to the interim relief sought in Motion Sequence No. 1 commencing on April 14, 2025, at 9:00 a.m. Within the Decision, the Court noted the allegations made by Plaintiff pertaining to Defendant's mental deterioration but declined to appoint a GAL at that time having determined, following the direct observation of the Defendant, that Defendant was not an impaired person requiring the assistance of a GAL in the litigation of this action.
On April 12, 2025, Plaintiff's counsel filed a stipulation executed by the parties resolving all of the relief sought in Motion Sequence No. 1 which was so ordered by the Court (NYSCEF Doc. No. 24), and the Court entered an Order converting the hearing date to a preliminary conference (NYSCEF Doc. No. 23).
On April 14, 2025, a preliminary conference was held wherein in-person appearances were made by Plaintiff, Plaintiff's counsel and Defendant as a self-represented litigant, after which a Preliminary Conference Stipulation and Order was signed by both parties and entered (NYSCEF Doc. No. 27) (hereinafter "Preliminary Conference Order") which included the following:
"Both parties shall review and comply with the Automatic Orders.[FN5]
* * *
AUTOMATIC STATUTORY RESTRAINTS (D.R.L. § 236[B][2]) Each party acknowledges that he/she has received a copy of the Automatic Statutory Restraints/Automatic Orders (D.R.L. § 236[B][2]). Each party acknowledges that he/she understands that he/she is bound by those Restrains/Orders during the pendency of this action, unless terminated, modified, or amended by the order of the Court upon motion of either party or upon written agreement between the parties duly executed and acknowledged."[FN6]
The Preliminary Conference Order set forth numerous directives including requiring that both parties file statements of net worth by April 25, 2025. To facilitate that directive, a blank statement of net worth form was provided to both parties during the conference and a copy was filed as Court Exhibit E (NYSCEF Doc. No. 29).
On April 25, 2025, Plaintiff's counsel filed Plaintiff's statement of net worth with the required annexed documents (NYSCEF Doc. No. 32).
To date, Defendant has not filed his statement of net worth with required documents in violation of the Preliminary Conference Order and Court Rules.[FN7]
Notably, on April 25, 2025, Defendant filed a request (dated April 10, 2025) for a two-week extension to file his statement of net worth (NYSCEF Doc. No. 35), which if granted would have extended (from the date of filing, not the date of letter) the deadline to file his statement of net worth would have been May [*5]9, 2025. While this extension was not granted, the filing was nonetheless not made even by the requested extended deadline.
On May 9, 2025, Plaintiff's counsel filed a pre-motion conference request (NYSCEF Doc. No. 50) seeking Court intervention pertaining to Defendant's failure to comply with discovery deadlines, failure to file a statement of net worth and concerns that Defendant may be engaging in wasteful dissipation of marital assets:
"Although pursuant to Section (G)(2)(c) of the Preliminary Conference Order the Defendant's responses to the Plaintiff's discovery demands are not due until May 30, 2025 — without any financial documents or the Defendant's Statement of Net Worth the Defendant is unable to address issues of temporary spousal support, temporary child support, interim counsel fees or Defendant's compliance (or non-compliance) with the "automatic orders" attendant to matrimonial actions under DRL § 236(B)(2)(b). The Plaintiff has serious concerns that the Defendant may be actively dissipating marital assets based on statements made by the Defendant on publicly accessible social media (specifically the Defendant's TikTok "live streams" as recently as this week). The Plaintiff advises that she has limited information on the amount and location of funds maintained by the Defendant — both personally and/or related to the Defendant's law firm.
* * *
To date the Defendant has neither filed the required Statement of Net Worth nor produced any of the requested financial information or documents. While the Defendant has essentially claimed to be "too busy" with the Defendant's law practice to comply with Court Ordered deadlines — the Defendant's postings on social media suggest that the Defendant is "busy" spending significant portion of time on his boat consuming copious amounts of cannabis."
On May 10, 2025, an Order was entered scheduling a pre-motion conference to be held on May 14, 2025, at 9:00 a.m., wherein all parties and counsel were directed to appear (NYSCEF Doc. No. 51).
On May 14, 2025, a pre-motion conference was held wherein in-person appearances were made by Plaintiff, Plaintiff's counsel and Defendant as a self-represented litigant. A so ordered transcript from the conference was filed (NYSCEF Doc. No. 54) (hereinafter "Transcript"). While Defendant initially advised the Court that he had retained counsel who could not appear at the conference,[FN8]
further investigation by the Court revealed that Defendant had not retained counsel as no engagement agreement or notice of appearance had been filed,[FN9]
and following inquiry by the Court, Defendant confirmed that he had not yet engaged any attorney.[FN10]
 Accordingly, the conference proceeded with Defendant as a self-represented litigant.
During the conference Plaintiff's counsel indicated that his client was concerned about [*6]Defendant's continued erratic behavior including his use of the social media platform TikTok (hereinafter "TikTok"), including representations made during recordings of Defendant on TikTok that he had gifted significant sums of funds believed to be in excess of twenty or thirty thousand dollars:[FN11]

"TikTok has the ability for individuals to give gifts to other people on TikTok, so you go live on TikTok and then it's showing what you're doing live. [Defendant], from what we can tell, has given away well in excess of twenty or thirty thousand dollars in the last two months to just third parties, individuals, and bragged about it very openly. We have recorded video of all of this. He talks about giving Pegasuses, giving universes. A universe costs $532 to the individual who gives it and it has a cash value that's redeemable by the person who receives it of around $500."
Plaintiff's counsel marked as Court Exhibit 1 (NYSCEF Doc. No. 52)[FN12]
a summary of certain TikTok recordings wherein he noted the following including asserted quotes of Defendant:
"4.5.25 Part 2:
2:29-2:35: "I'm gonna pegasus" with a woman as the background. Pegasus is a virtual gift you get after reaching the highest "gifter level."
- To reach level 50 gifter, you need to spent a significant amount of real money on gifts (estimated around $845,000.00). You can then send Pegasus during a tick tok live.
 4.5.25 part 3
5:30-6:00: "That's the Lord Marcellus one. I don't even know how many of these I sent but I send a lot of these. I sent a lot of Lord Marcellus'. That's a vault gift. It's the best gift you can send other than the Pegasus"
- Lord Macellus is a Tik Tok gift worth $10
 4.5.25 part 4
1:46-1:51: "You wanna be like me. You wanna drop the uni's. You wanna drop the vaults."
- Tick tok Universe $500
- Tik tok vaults are limited-time opportunities to unlock exclusive, high-value gifts during Tic Tok Live sessions
49:27-49:32: "I love to drop tik tok universes. I like to do all of that crazy shit"
51:00-51:16: Banned from giving on tik tok account because they limit how much giving an account can do in a day
4.5.25 part 5:
9:45: "I gave her uni's" referring to a woman he was "incompatible with"
17:05: "I've given her gifts. I've given this girl gifts." Referring to woman on screen."
Plaintiff's counsel also played several TikTok recordings of Defendant,[FN13]
one of which was asserted to have been made the day before the conference referring to this action, two of which were asserted to have been recorded just prior to the last conference in this courthouse with one being filmed in the hallway outside the courtroom and the other being filmed in the courthouse bathroom:[FN14]

"I would note, your Honor, this is all while my client is not receiving child support, spousal support, has received no temporary counsel fees. We have no idea what the scope of the money that he has dissipated is except these very specific statements that he has made that are all recorded and that are all publicly accessible, talking about all the gifts that he has given, all of this money that he's giving away and, respectfully, and, again, I'm not trying to inflame things, but [Defendant], aside from TikTok streaming live here in the courthouse in direct contradiction to the rules, last night was on TikTok live and made the following statements which, again, we have recorded. "CJB got Court tomorrow. Ain't no mother fucking judge check me. CJB is vibing right now. Don't worry about the consequences." Respectfully, Judge, aside from ignoring an array of Court Orders, as an attorney and officer of the Court, [Defendant] going live on TikTok the night before Court and saying that your Honor is not going to check him and that he has Court tomorrow and then live streaming from the hallway of the courthouse, this demonstrates the level of sort of recklessness and total lack of regard for the rules and the orders of your Honor."
While these recordings were being played by the Court, this Court visually observed Defendant bobbing his head to the music playing in the background and mouthing the words to what appeared to be song lyrics he was signing in the videos. When asked by the Court if these videos were of the Defendant, he responded that they were of his "persona" for which he referred to himself in the third-person providing the following responses:[FN15]

THE COURT: [Defendant], you have been handed what's been marked as Court Exhibit Number 1 and you have had the opportunity in here in Court to listen to recordings of TikTok, what appear to be TikTok recordings that you have made. Were you on those TikTok videos that were seen by the Court earlier today?
[Defendant]: My parody persona was on the videos, but yes, my physical being and my [*7]likeness was on those, yes, Judge.
THE COURT: Thank you very much. There was an allegation that you made two TikTok videos in this courthouse today before this Court appearance in the hallway and also in the bathroom of the courthouse; is that correct?
[Defendant]: Yes. My parody self made those, CJB made those, Judge.
THE COURT: Is CJB not you?
[Defendant]: Well, the whole TikTok thing is a public act, so yes, I mean, sitting here as an attorney before your Honor, this is [Defendant]. What you see on there is CJB times three because I have three accounts, so he's not even referencing  there's XXXX, XXXX and XXXX and I get banned usually on two of them. I got banned from XXXX and XXXX, so that was on XXXX —
THE COURT: Why did you get banned?
[Defendant]: Because TikTok has  it's interesting, so I smoke tobacco. Actually, last night, I got banned and if you guys were watching,[FN16] I held up a cigarette and I got banned within thirty seconds, so you can't smoke tobacco on there. Also, too, some of it is construed as, let's say, aggressive tendencies. They have very, let's say, tight community guidelines, so if I set my live streams to open which is eighteen or  sorry, anybody can come to those, they are much more  they are stricter. If you set your own restriction as to 18 plus, you could basically do whatever you want, but lately, I have been trying to get more traction. This is, essentially, to address the gifting, they're not just gifts. These are business expenses. We're trying to get a media company off the ground, that's what we're doing; CJB Media, across the world, United States, Germany, Philippines, VietNam, Brazil, a lot of different countries, Judge. And the one that we made before, in the courtroom that we were referencing, some of the ladies that are going to be coming to the United States to see CJB, to do this whole thing in Central Park and do some stuff, people are already getting visas, they're already making it happen. This is an actual real business expense. This is not just looking at me, I'm a thirsty dad, broken hearted, hopeless romantic, giving gifts, so we're trying to get something off the ground and the Plaintiff is quite aware of that because we even went live the first couple of lives and we got a few gifts.
THE COURT: So is your position that CJB is your alter ego?
[Defendant]: In terms of public persona and what we do, yes, I mean, I'm a humble dad. I had  before April 9th [FN17] which was my second daughter's birthday, I was giving baths and chilling with my daughters and hanging out with my son who I would love to see, of course, but after April 9th, you know, we basically, you know, we stepped it up a little bit because, you know, at this point, my back is against the wall a little bit when it comes to [*8]how I feel about how my public persona should be. For the last thirteen years, I've kind of sheltered myself. I also freestyle rap. I give inspiration, hope and expression."
While characterizing his TikTok expenditures as investment rather than gifts, Defendant confirmed that he has spent at least $300,000.00 on TikTok since February of this year, approximately $275,000.00 of which was spent following the commencement of this litigation, while advising that it is nearly impossible to track when TikTok gifts are made:[FN18]

THE COURT: Let me ask you a question. There is an allegation that you gave at least one universe. Have you given away any money since this action was commenced?
[Defendant]: So, Judge, when it comes to give away money, I don't  I can't affirmatively say I have given away money. Have I made  these are marketing and business expenses.
THE COURT: Let me ask you it differently. On TikTok, whether it be a universe, a Pegasus, I don't know, a reindeer, whatever you title it, have you given away any money on TikTok?
[Defendant]: So  and I'm not playing —
THE COURT: Have you expended any money on TikTok?
[Defendant]: Yes, sir, I spent business expenses on TikTok.
THE COURT: How much?
[Defendant]: I don't know.
THE COURT: Can you give me an approximate amount?
[Defendant]: I want to be truthful and honest with you.
THE COURT: I hope so.
[Defendant]: Yes, of course, Judge. To the best of my knowledge, around 300 grand.
THE COURT: Since this action was commenced?
[Defendant]: Not since this action was commenced. I believe in my entirety of my life on TikTok.
THE COURT: So in the entirety of your life, you've given away 300 grand on TikTok.
[Defendant]: It could be more, Judge, I don't know the exact number.
THE COURT: It could be more?
[Defendant]: Yes, Judge.
THE COURT: Okay, and during what period, when did that start?
[Defendant]: I've only been on TikTok since end of February, February 28th, so since February 28th until now.
THE COURT: February 28 of 2025?
[Defendant]: Yes, Judge, and I went viral, I have over 167,000 followers on my main account. I have two other accounts that are growing steadily and strong core. We were even doing battles on the way here while I was driving.
THE COURT: Since February 28, 2025, you believe that you have given away $300,000 or more on TikTok, you've expended.
[Defendant]: So just with the caveat, yes, for business expenses and purposes to get CJB [*9]Media off the ground, yes, we have made an investment.
THE COURT: And how much have you invested on TikTok since this action was commenced?
[Defendant]: So to revert back to my previous answer, I believe 300K. It could be more, Judge. I'm not the best with accounting.
THE COURT: Well, since April 9th when this action was commenced, how much money do you think that you have expended on TikTok?
[Defendant]: Let's say, the majority of it, let's say 275K. Before April 9th — I mean it was a lot. Judge, I don't want to give you bad info, Judge. I think it was a lot even before April 9th."
When asked if he had read the Automatic Orders and the provisions of the Preliminary Conference Order pertaining to the Automatic Orders Defendant confirmed that he had,[FN19]
and when asked if he felt that he had complied with the Automatic Orders by spending nearly $300,000.00 on TikTok expenditures he responded, "Yes, because I want to do well for myself and my family. If this actually works, we'll be millionaires."[FN20]

The Court then directed that there would be a recess. When recalling the case an appearance was made by John Charles Guttridge, Esq. (hereinafter "Attorney Guttridge")[FN21]
who, subject to a further written decision, was appointed as GAL for Defendant, with the Court having found Defendant to be an impaired person.[FN22]
 The Court disclosed on the record that during the recess it communicated with Attorney Guttridge solely to determine if he was willing to accept the assignment, but made no other communications pertaining to the action.[FN23]
Following consultation with Plaintiff's counsel and Defendant during the appearance, Attorney Guttridge confirmed on the record that he had no conflicts of interest that prevented him from taking the appointment.[FN24]
 No objection to the appointment was made by Defendant. To the contrary, following the appointment Attorney Guttridge sat next to Defendant throughout the entirety of the conference during which time this Court observed both communicating and consulting with each other.
The Court then advised that a formal decision and order would be entered by the Court memorializing the determination made on the record inclusive of a GAL Consent and GAL [*10]Financial Disclosure Affidavit annexed to the decision as exhibits.[FN25]
After conferring with Attorney Guttridge, Defendant then consented to his not expending any funds on TikTok until the next Court appearance.[FN26]
The Court then scheduled a status conference to be held on May 19, 2025, at 9:00 a.m., wherein Attorney Guttridge could advise the Court of his position with respect to the level of impairment of Defendant and any other further actions recommended, and wherein further applications would be heard by the Court.

 Legal Analysis
1. Guardian Ad Litem Appointment.
Several vehicles exist under New York State Law to protect litigants who are either impaired or incapacitated. Pursuant to New York State Civil Practice Law and Rules (hereinafter "CPLR") § 1202, a court may, on motion or sua sponte, appoint a GAL for a litigant:
"(a) By whom motion made. The court in which an action is triable may appoint a guardian ad litem at any stage in the action upon its own initiative or upon the motion of:
1. an infant party if he is more than fourteen years of age; or
2. a relative, friend or a guardian, committee of the property, or conservator; or
3. any other party to the action if a motion has not been made under paragraph one or two within ten days after completion of service.
(b) Notice of motion. Notice of a motion for appointment of a guardian ad litem for a person shall be served upon the guardian of his property, upon his committee or upon his conservator, or if he has no such guardian, committee, or conservator, upon the person with whom he resides. Notice shall also be served upon the person who would be represented if he is more than fourteen years of age and has not been judicially declared to be incompetent.
(c) Consent. No order appointing a guardian ad litem shall be effective until a written consent of the proposed guardian has been submitted to the court together with an affidavit stating facts showing his ability to answer for any damage sustained by his negligence or misconduct."
While a guardian appointed under Article 81 of the New York State Mental Hygiene Law is appointed with a delineated scope of authority to made decisions for an individual determined by the court to be an incapacitated person or person in need of a guardian for their personal and/or property management needs, a GAL is not appointed as a decision-maker, but is instead situated to provide assistance to the subject individual who will make their own decisions in the litigation with the assistance of the GAL to ensure that the individuals' rights are protected:
"Petitioner also argues that 1234 Broadway LLC v Feng Chai Lin (25 Misc 3d 476 [Civ Ct, NY County 2009]) stands for the proposition that the appointment of a guardian ad litem does not take away the autonomy of the ward, such that petitioner *221 was free to negotiate an agreement with respondent in the absence of the GAL. However, 1234 [*11]Broadway LLC (25 Misc 3d at 476) essentially stands for the proposition that a guardian ad litem cannot defy the wishes of their ward.* An attempt to leverage a ward's autonomy as such to support a proposition that an adversary may effectively ignore a finding of a court that a litigant is incapable of protecting their interest is a bad-faith perversion of the holding. For the same reason, petitioner's assertion that respondent is the party who initiated negotiations to settle the matter with a surrender is irrelevant. The appropriate response to a settlement overture from an adversary represented by a guardian ad litem in the litigation is to politely decline and notify the guardian of the exchange."
(276-W71 LLC v. G.S., 80 Misc 3d 216 [Civ. Ct., NY County 2023]; see also, 1234 Broadway LLC v. Feng Chai Lin, 25 Misc 3d 476, 495, 883 N.Y.S.2d 864 [Civ. Ct., NY County 2009])
The appointment of a GAL for a litigant has been held appropriate when a trial court has determined the individual to be in an "apparently chronic irrational and agitated state" resulting in the individual's inability to effectively litigate their case without assistance (Anonymous v. Anonymous, 256 AD2d 90 [1st Dept 1998]).
In reversing a decision of the Family Court which terminated the parental rights of the petitioner, the trial court was found to have erred in failing to appoint a GAL despite it having become apparent the litigant was incapable of assisting in her defense:
"It is well settled that courts cannot "shut their eyes to the special need of protection of a litigant actually incompetent but not yet judicially declared such. There is a duty on the courts to protect such litigants" (Sengstack v. Sengstack, 4 NY2d 502, 509, 176 N.Y.S.2d 337, 151 N.E.2d 887 [1958]). Indeed, "[t]he public policy of this State ... is one of rigorous protection of the rights of the mentally infirm" (Vinokur v. Balzaretti, 62 AD2d 990, 990, 403 N.Y.S.2d 316 [2d Dept. 1978]). Thus, " 'where there is a question of fact ... whether a guardian ad litem should be appointed, a hearing must be conducted' " (Resmae Mtge. Corp. v. Jenkins, 115 AD3d 926, 927, 983 N.Y.S.2d 64 [2d Dept. 2014] [emphasis added]; see Matter of Mary H. [Sanders—Spencer], 126 AD3d 794, 795, 5 N.Y.S.3d 270 [2d Dept. 2015]), and the failure to make such an inquiry once a meritorious question of a litigant's competence has been raised requires remittal (see Matter of Foreclosure of Tax Liens by the City of Ithaca, 283 AD2d 703, 705, 724 N.Y.S.2d 211 [3d Dept. 2001] )."
(see, Matter of Jesten J.F., 167 AD3d 1527 [4th Dept 2018]; see also, Cowell v. Dickoff, 60 AD3d 716 [2d Dept 2009] "The order granting the defendant's motion to dismiss the action should have been vacated in the furtherance of justice because the plaintiff submitted evidence that he was incapable of adequately prosecuting the action and no inquiry was held as to the possible need for the appointment of a guardian ad litem for him").
In the event issues of fact arise in connection with the potential appointment of a GAL, the Court must conduct a hearing (see, Piggot v. Lifespire, 149 AD3d 785 [2d Dept 2017]); see also, Shad v. Shad, 167 AD2d 532 [2d Dept. 1990]). If such a hearing is held, the Court must find by a preponderance of the evidence that the subject individual requires the appointment of a [*12]GAL due to the individual's inability understand the litigation, defend their rights and to the extent that they have counsel assist that counsel (see, New York Life Ins. Co., v. V.K., 184 Misc 2d 727 [NY Civ. Ct. 1999]; see also, In re Philip R., 293 AD2d 547 [2d Dept 2002]).
In the instance when a GAL is deemed appropriate, the appointment of a GAL is not effectuated until the appointed individual files a GAL Consent to Appointment and a GAL Financial Disclosure Statement (see, In re Bush, 36 Misc 3d 51 [App. Term, 2d Dept, 11th and 13th Judicial Districts 2012]). The GAL Financial Disclosure Statement must be sufficiently detailed to meet the statutory objective of confirming that the GAL has the financial means to answer for any damages caused by their negligence or misconduct in carrying out their duties as GAL (see, In re Smith-Guzman, 11 Misc 3d 1092(A) [Sup. Ct. Kings County 2006]; see also, Application of Weingarten, 91 Misc 2d 788 [NY Civ. Ct. 1978]).
The manner within which a GAL may be compensated for services rendered as GAL, during the course of litigation or upon the completion thereof, is set forth in CPLR § 1204:
"A court may allow a guardian ad litem a reasonable compensation for his services to be paid in whole or part by any other party or from any recovery had on behalf of the person whom such guardian represents or from such person's other property. No order allowing compensation shall be made except on an affidavit of the guardian or his attorney showing the services rendered."
Here, Plaintiff commenced this action with the filing of the Complaint with Motion Sequence No. 1, asserting Defendant's mental condition had deteriorated over several weeks leading up to the commencement of this action arguing that the substantial relief requested was warranted due to her belief that Defendant's erratic behavior presented a manifest danger to she and the parties' Children. While this Court recognized the possible need for the appointment of a GAL for Defendant upon review of the initial filings, the undersigned declined to do so after having engaged in direct observation and inquiry of Defendant at the first appearance. However, at the last conference the Court made such an appointment having determined Defendant to require the assistance of a GAL in order to effectively protect his rights in the instant litigation. The Court made this appointment without first holding a hearing, having found that Plaintiff's unrefuted allegations and corroborating evidence presented to the Court during the conference left no issues of fact pertaining to the potential appointment of a GAL for Defendant which would necessitate a hearing.
Similar to the situation in Anonymous, supra, wherein the trial court's appointment of a GAL to assist a litigant in a matrimonial action was upheld as having been found necessary to protect that litigant's interests following the trial court having observed the litigant in a chronic irrational and agitated state which prevented the litigant from assisting his counsel in his defense, this Court' observations of Defendant have led to the determination that Defendant's unrefuted actions along with his conduct during the conference were irrational, troubling and require the appointment of a GAL due to this Court's finding that without such assistance from a GAL Defendant will be unable to effectively protect his rights in this action.
In making this determination, this Court considered the following specific conduct of Defendant all which call into question Defendant's ability to have sound judgment, engage in decision-making, and to litigate this action without the assistance that a GAL would afford him.
1. Lack of Candor to the Court — While a litigant in this case, as a licensed New York State attorney Defendant is also an officer of this Court, and bound by the New York State Rules of Professional Conduct (hereinafter "RPC")[FN27] and is required to engage in candor to the Courts (see, In re Scheideler, 147 AD3d 29 [2d Dept 2016]; see also, In re Jaffe, 78 AD3d 152 [1st Dept 2010]; RPC Rule 3.3 [FN28]
; RPC Rule 3.2 [FN29]
; RPC Rule 8.4 [FN30]
). Here, Defendant made the representation at the last conference that he was represented by legal counsel, and only following further investigation by and inquiry of this Court, disclosed that he had not yet retained counsel. It is unclear if Defendant's statement to the Court was done intentionally to provide misinformation or if his representation regarding legal counsel was inadvertent. However, with the assistance of a GAL, Defendant will receive assistance in preparation for conferences and in all other respects pertaining to this litigation.
2. Failure to Comply With Preliminary Conference Order — While this litigation was only commenced a short time ago, Defendant has violated the Preliminary Conference Order and Court Rules by failing to timely file a statement of net worth confirming at the conference that despite the deadline having passed weeks ago that he had just a day earlier sought assistance from a financial advisor to complete same (see, Uniform Rules of the New York State Trial Courts § 202.16). This has frustrated Plaintiff's ability to determine the finances of the parties to proceed with this litigation including the possible application for support from Defendant for Plaintiff and the Children (see, Wallach v. Wallach, 37 AD3d 707 [2d Dept 2007]). This has further exposed Defendant to the possibility of being held in contempt (see, Judiciary Law § 753[A][3]; see also, El-Dehdan v. El-Dehdan, 26 NY3d 19, 29 [2015]; Matter of Hughes v. Kameva, 96 AD3d 845, 846 [2d Dept 2012]; Cassarino v. Cassarino, 149 AD3d 689, 690 [2d Dept 2017]; RPC Rule 3.3 [FN31]). As Plaintiff's counsel has indicated a desire to engage in motion practice with respect to Defendant's asserted violations of the orders of this Court, the [*13]appointment of a GAL will assist Defendant in addressing such motion practice and avoiding future deviations from the directives of this Court including coordinating the filing of Defendant's statement of net worth.
3. Failure to Comply with Automatic Orders - Defendant further appears to have violated the Automatic Orders despite confirmation of having read same when served upon him and being directed to comply with same in two provisions within the Preliminary Conference Order that Defendant executed in the presence of this Court, as Defendant confirms that he has expended approximately $275,000.00 on TikTok since the commencement of this action. Initially, at the last conference while not having had the benefit of Defendant's statement of net worth, Plaintiff's counsel expressed concern that Defendant may have dissipated marital assets between $20,000.00 and $30,000.00, but then discovered through Defendant's admissions made on the record that it is possible that over $300,000.00 of funds have been expended by Defendant in just the past several weeks. Notably, these funds were utilized during a period within which Plaintiff's counsel asserts that Plaintiff and the parties' Children have received no financial support from Defendant who is the family's primary wage earner. The apparent failure to comply with the Automatic Orders is yet another questionable decision made by Defendant as they have been determined to "constitute unequivocal mandates of the court" a violation of which may lead to a finding of civil contempt (see, Spencer v. Spencer, 159 AD3d 174 [2d Dept. 2018]; see also DRL § 236(B)(2)(b) and Uniform Rules for Trial Courts 22 NYCRR § 202.16-a).
4. Substance Abuse — This Court is concerned that Defendant may have a substance abuse problem which is adversely impacting Defendant's ability to engage in sound judgment and decision-making to permit him to engage in this litigation without the assistance of a GAL. These concerns are based upon the submissions made to this Court by Plaintiff which has been unrefuted by Defendant, along with this Court's direct observation of Defendant in the last conference.
5. 
 Demeanor — As noted herein, Defendant's demeanor is troubling as he has engaged in online activity through TikTok wherein he acknowledges that his conduct has resulted in his twice being banned from the platform and his public posts have included those which appear to have reflected poorly upon Defendant as an attorney as he has mocked the court system in one post while recording two others within the courthouse wherein this litigation is pending despite signage indicating that doing so would be in violation of the Court Rules. While these videos were being played for this Court in the presence of Defendant, he appeared to have no sense of concern for his conduct or the possible ramifications. Instead, Defendant chose to bob his head to the music in the background of these videos while mouthing the words to the songs played therein, while bragging about his conduct to the student interns observing the proceeding. This, in conjunction with the other issues set forth herein, raise concerns about Defendant's mental state as a litigant and officer of this Court.[FN32]
While this Court is not an ethics tribunal and makes no finding as to if Defendant has engaged in any professional misconduct under the RPC or otherwise, or if any conduct engaged in by Defendant has been willful, this Court is very concerned about Defendant's well-being and has sought to ensure that Defendant's rights are protected through the appointment of a GAL for Defendant.[FN33]

Therefore, this Court sua sponte, on its own initiative, hereby appoints John Charles Guttridge, Esq., as GAL for Defendant.
Based upon the foregoing, it is hereby
ORDERED that the following is hereby appointed as GAL for Defendant, with an appointment to continue until further order of this Court: John Charles Guttridge, Esq., Guttridge & Cambareri, P.C., 222 Bloomingdale Rad, Suite 301, White Plains, New York 10605, Telephone: 914-631-6900, E-Mail: [email protected]; and it is further
ORDERED that by May 16, 2025, John Charles Guttridge, Esq. shall register as a NYSCEF user in this action in the capacity as GAL for Defendant; and it is further
ORDERED that by May 16, 2025, John Charles Guttridge, Esq. shall execute and file the following documents annexed hereto as exhibits to this Decision and Order: (1) Exhibit A — GAL Consent; and (2) Exhibit B — GAL Financial Disclosure Affidavit; and it is further
ORDERED that any compensation of John Charles Guttridge, Esq. as GAL for Defendant shall be made pursuant to CPLR § 1204 by application made by order to show cause with an accompanying affirmation of services rendered with annexed billing statements itemizing the services provided, the time spent for each service and the hourly rate requested for the services provided; and it is further
ORDERED that by May 16, 2025, Plaintiff's counsel shall serve Defendant and Attorney Guttridge, via e-mail and NYSCEF filing, this Decision and Order with Notice of Entry, and by that date shall file an Affidavit of Service; and it is further
The foregoing constitutes the Decision and Order of the Court. 
Dated: May 15, 2025
White Plains, New York
ENTER:
HON. JAMES L. HYER, J.S.C.

DECISION AND ORDER EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
X
M.B.,                         Plaintiff,     GUARDIAN AD LITEM
-against-                      CONSENT TO
                                   APPOINTMENT
C.B.,                         Defendant.
X
I, John Charles Guttridge, Esq., hereby submit to the Court this Consent to Appointment consenting to serve as the court appointed Guardian Ad Litem ("GAL") for [Defendant], in the above-captioned action, by Court Order, dated May 15, 2025.
Dated: ______________, New York
May __, 2025
__________________________________
John Charles Guttridge, As GAL
Sworn to me this _____ day of
May, 2025
_________________________
Notary Public

DECISION AND ORDER EXHIBIT B
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
X
M.B.,                Plaintiff,                GUARDIAN AD LITEM
     -against-                            FINANCIAL DISCLOSURE
                                       AFFIDAVIT
C.B.,                Defendant.
X
STATE OF NEW YORK            }                                           }s.s.:
COUNTY OF WESTCHESTER }
The undersigned, John Charles Guttridge, Esq., being duly sworn, deposes and swears the following to be true under the penalties of perjury:
1. I have filed a consent to serve as the court appointed Guardian Ad Litem in the above-named proceeding.
2. Pursuant to Civil Practice Law and Rules, Article 1202(c), I am providing this Affidavit of Financial Disclosure to confirm that I have net assets sufficient to showing my ability to answer for any damage sustained by my negligence or misconduct in that I have a net worth of over $100,000.00 as of the date of this affidavit.

Signature:_________________________________________               John Charles Guttridge, As GAL
Sworn to me this _____ day of
May, 2025
_________________________
Notary Public

Footnotes

Footnote 1:See, NYSCEF Doc. No. 3, Plaintiff's Affidavit ¶ 1-4.

Footnote 2:See, NYSCEF Doc. No. 3, Plaintiff's Affidavit ¶ 6-7.

Footnote 3:See, NYSCEF Doc. No. 3, Plaintiff's Affidavit ¶ 9.

Footnote 4:See, NYSCEF Doc. No. 3, Plaintiff's Affidavit ¶ 14.

Footnote 5:See, NYSCEF Doc. No. 27, Preliminary Conference Order ¶ F.

Footnote 6:See, NYSCEF Doc. No. 27, Preliminary Conference Order ¶ J.

Footnote 7:See, Uniform Rules of the New York State Trial Courts § 202.16.

Footnote 8:See, NYSCEF Doc. No. 54, Transcript Pg. 3: 6-22.

Footnote 9:See, NYSCEF Doc. No. 54, Transcript Pg. 3: 23-25; Pg. 4: 1-21.

Footnote 10:See, NYSCEF Doc. No. 54, Transcript Pg. 4: 22-25; Pg. 5:1-22.

Footnote 11:See, NYSCEF Doc. No. 54, Transcript Pg. 8: 16-23; Pg. 9: 1-4.

Footnote 12:See, NYSCEF Doc. No. 54, Transcript Pg. 20: 3-10.

Footnote 13:The Court directed that copies of these recordings be placed on a thumb drive and provided to the Court by the end of business day. See, NYSCEF Doc. No. 54, Transcript Pg. 14: 20-25. Notably, signage has been posted prominently in several locations in the hallway leading to the courtroom where the last conference was held wherein these recordings were made including the following directive, "Court Rules prohibit the use of cameras or audio/visual recording devices in this courthouse without permission from the Court administrator or, in a courtroom the presiding judge." 

Footnote 14:See, NYSCEF Doc. No. 54, Transcript Pg. 10: 3-25; Pg. 11: 1-6.

Footnote 15:See, NYSCEF Doc. No. 54, Transcript Pg. 20: 14-25; Pg. 21: 1-25; Pg. 22:1-25; Pg. 23: 1-23.

Footnote 16:During the conference, two student interns were seated in the rear of the courtroom in an effort to learn more about our legal system and the manner within which the court system operates including how attorneys who appear in court conduct themselves, and on several occasions when Defendant was addressing this Court, he physically turned to address his statements to the interns in an apparent effort to brag about his conduct.

Footnote 17:April 9, 2025, was the date of commencement of this action.

Footnote 18:See, NYSCEF Doc. No. 54, Transcript Pg. 24: 10-25; Pg. 25: 1-25; Pg. 26: 1-25; Pg. 27: 1-9.

Footnote 19:See, NYSCEF Doc. No. 54, Transcript Pg. 32: 5.

Footnote 20:See, NYSCEF Doc. No. 54, Transcript Pg. 32: 10-12.

Footnote 21:While a GAL need not be an attorney, Attorney Guttridge was selected by this Court for appointment as GAL for Defendant in this litigation as he has been admitted as an attorney to the practice of law in New York State for approximately thirty-five years while focusing his practice primarily in the areas of family and matrimonial law.

Footnote 22:See, NYSCEF Doc. No. 54, Transcript Pg. 38: 17-25; Pg. 39: 1-17.

Footnote 23:See, NYSCEF Doc. No. 54, Transcript Pg. 39: 18-23.

Footnote 24:See, NYSCEF Doc. No. 54, Transcript Pg. 39: 24-25; Pg. 40: 1-14.

Footnote 25:See, NYSCEF Doc. No. 54, Transcript Pg. 40: 25: Pg. 41: 1-7.

Footnote 26:See, NYSCEF Doc. No. 54, Transcript Pg. 47: 25; Pg. 48: 1-25; Pg. 49: 1-5.

Footnote 27:See, 22 NYCRR 1200.

Footnote 28:See, 22 NYCRR 1200, Rule 3.3 "Conduct Before A Tribunal (a) A lawyer shall not knowingly: (1) make a false statement of fact of law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal toby the lawyer."

Footnote 29:See, 22 NYCRR 1200, Rule 3.3 "In representing a client, a lawyer shall not use means that have no substantial purpose other than to delay or prolong the proceeding or to cause needless expense."

Footnote 30:See, 22 NYCRR 1200, Rule 8.4 "A lawyer or law firm shall not ***(h) engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer."

Footnote 31:See, 22 NYCRR 1200, Rule 3.3 "(f) In appearing as a lawyer before a tribunal, a lawyer shall not: (2) engage in undignified or discourteous conduct; (3) intentionally or habitually violate any established rule of procedure or of evidence; or (4) engage in conduct intended to disrupt the tribunal."

Footnote 32:See, 22 NYCRR 1200, Preamble: A Lawyer's Responsibilities [1]: "A lawyer, as a member of the legal profession, is a representative of clients and an officer of the legal system with special responsibility for the quality of justice.***In addition, a lawyer should further the public's understanding of and confidence in the rule of law and the justice system because, in a constitutional democracy, legal institutions depend upon popular participation and support to maintain their authority."

Footnote 33:Defendant shall adhere to all of the ethical obligations of an attorney admitted to practice law in the State of New York, including, but not limited to, those set forth in the RPC outlined in 22 NYCRR 1200.